**Electronically Filed
Supreme Court
SCWC-17-0000727
31-AUG-2021
08:34 AM
Dkt. 9 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

RALPH CURTIS RIVEIRA, JR.,
also known as Ralph C. Riveira, Jr.,
Petitioner/Defendant-Appellant.

SCWC-17-0000727

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000727; CASE NO. 1PC121001439)

AUGUST 31, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.

OPINION OF THE COURT BY EDDINS, J.

The prosecution injected victim impact evidence into Ralph Riveira's burglary trial. And during opening statement and closing argument, the State spotlighted the crime's effect on the burglarized family. It also told the jurors that defense counsel tried to "trick" them.

The prosecution's narrative arc focused on the victims' emotional state and actions after the crime.  This constituted prosecutorial misconduct.  So did the comment besmirching defense counsel.  But the evidence overwhelmingly established Riveira's guilt.  We conclude that the misconduct was harmless and affirm Riveira's conviction.[1]

## I.

A burglary happened at a Kailua house.  The homeowner returned home.  She saw a man running in her backyard.  He was carrying a black object with black cords hanging from it.  The homeowner ran after him to get "a good visual."  She did not see his face.  But she had an unobstructed view of the man from about twenty-five feet.  The fleeing man was heavy-set and had short hair.  He wore a neon green construction shirt, dark boots, and plaid shorts.  The man hopped the backyard fence.

The homeowner later realized that her laptop and her children's gaming devices were taken.  A towel she had laid on the floor for her dog had a boot print.

---

[1]    Riveira also challenges the ICA's holding that (1) the circuit court did not err by denying his motion to suppress field show-up identifications; (2) the circuit court did not abuse its discretion in admitting a full-body arrest photograph of Riveira and another photograph of him found in a truck connected to the burglary; and (3) the circuit court did not err by instructing the jury on accomplice liability.  We do not find error in the ICA's analysis covering these issues.  Riveira's allegations of improper statements by the prosecution that are not addressed here also lack merit. We consider Riveira's claim that the trial court plainly erred in allowing the burglarized family's impact testimony as part of the prosecutorial misconduct analysis.

After the burglar jumped the fence, the homeowner called 911. She described "what [the man] looked like, what he was wearing, and what he was carrying."

The homeowner also told the 911 operator about a red Toyota Tundra parked by her mailbox. She recited the truck's license plate number. And she relayed that a woman was sitting inside. The woman's feet rested on the dashboard; her toenails were painted. Shortly after, the truck left.

Within ten minutes, the police stopped a red Toyota Tundra about a mile and a half from the burglarized home. The truck matched the license plate number given by the homeowner. Riveira sat in the front passenger seat. The truck's owner, a woman with painted toenails, was the driver.[2] Both were arrested. The police impounded the truck and got a search warrant.

About ten minutes before the burglary's end, the homeowner's neighbor spotted a similar Toyota Tundra parked on a nearby street. He told the police he saw a man sitting in the truck. The neighbor had "a clear visual." The man had short hair and wore a yellow construction shirt. They made eye contact; the man gave him a shaka. About five minutes later,

---

[2] The female driver died before trial. The court read a stipulation to the jury: ". . . [The driver] has passed away. Her passing is in no way related to this case in any way whatsoever."

the neighbor saw the truck again.  This time it drove down his and the homeowner's street.

After Riveira's detention, the police drove the homeowner and neighbor separately to Riveira's location for a field show-up.  Both identified Riveira as the man they had seen.  At trial, the homeowner testified: "[h]e was wearing the same plaid shorts, he had the same build, he had the same [dark boots]."  She said, "[t]he only thing [that] was different [at the field show-up] was [Riveira's] shirt; he was not wearing the construction neon shirt."  The neighbor identified Riveira partly based on his tattoos.  The homeowner identified the female driver as the woman in the truck by her mailbox; the toenails matched.

The police recovered the stolen property – a black laptop with a black cord and gaming devices - from the impounded truck.  Officers also retrieved Riveira's photograph from a bag in the truck.

At trial, the homeowner and neighbor testified.[3]  They detailed their encounters with the suspect and the truck.  They also discussed how they identified Riveira.  Police officers testified about the arrest, field show-ups, and truck search.  The jury viewed scene photographs depicting Riveira, the home,

---

[3]    The Honorable Rom A. Trader presided.

the truck, and the stolen property found in it.

The prosecution's trial narrative featured evidence and remarks about the crime's impact on the homeowner's family. The prosecution bookended its case with commentary regarding this impact. During opening statement, the deputy prosecuting attorney previewed the case: "[T]his is a case about a Kailua family who was burglarized. And more so than just losing electronics, the evidence will show that they lost their sense of security and ability to feel safe in their home. . . ." (Emphasis added.)

During the State's rebuttal closing argument, the prosecuting attorney showcased the victim impact evidence he had presented. The State's argument ended with a plea to convict Riveira for what he had done to the family:

> Do you remember what [the homeowner] said about this whole experience? It's affected me deeply. It's affected me deeply. You know, the evidence does show they got the electronics back. She still uses the laptop. The kids still play with the Nintendo devices. But more than electronics, the defendant took something else from them that they didn't get back, that's the ability to feel safe and secure in their own home.
>
> For most people, burglary is just something that happens to other people until it happens to them, and in this case it happened to the [family]. [The homeowner] had the unfortunate experience of interrupting the defendant in the middle of burglarizing her home, but she had the fortunate circumstance of having the sound mind to immediately realize it and do her best to get a description of the defendant, to get a description of the vehicle he would use to get away, to even get a description of the black object with the cord in his arms as he ran away. And, again, look at all the photos of the interior of that truck taken on February 24th, 2012, when they execute the search warrant, and you will see the only item in that truck that is black with a cord hanging off is her laptop. You saw [the

homeowner] testify. The [family was] not trespassed, they were burglarized.

Ladies and gentlemen, <u>I ask that you hold the defendant accountable for what he did to that family</u> and find him guilty as charged of Burglary in the First Degree.

(Emphases added.)

The State called the eyewitness homeowner's husband to testify. He wasn't home during the crime. The deputy prosecuting attorney asked a few questions relating to consent; the burglar did not have permission to enter or take any property from the family home. The prosecuting attorney then asked: "how did it make you feel after you had learned that you had been burglarized?" "Violated," he told the jury. Defense counsel failed to object.

The prosecution similarly questioned the homeowner about how the burglary affected her:

> [Prosecuting Attorney:] . . .[H]ow did it make you feel having your home burglarized on February 17th, 2012?
>
> [Homeowner:] Very violated. I'm a mother of children, and to have someone in my home, where my children sleep, this person has been in my property, and it's a very personal feeling, and I had a hard time sleeping afterwards. I was very concerned for my safety, for the safety of my family. And to this day I make sure that I put all electronics -- before I leave the home, I make sure I hide them because of -- of this occurrence. So it's affected me deeply.

Defense counsel again failed to object. He later cross-examined the homeowner about the crime's impact.[4]

_____

[4] Defense counsel's questions included:

Defense counsel objected to the prosecution's remarks relating to victim impact evidence only once, after the State's rebuttal closing argument.  At the bench, counsel objected "to the last couple of sentences" in the State's rebuttal argument.  These sentences seemingly relate to the prosecutor's plea to hold Riveira accountable for what he did to the family.  The court overruled the objection.

Defense counsel asked the court to reconsider its ruling, advancing a broader argument that the prosecuting attorney "went to the passion of the jury by saying imagine how [the homeowner felt] based upon what had happened, not about the items that were taken, [but] about . . . [the family's] security."  The prosecuting attorney denied making any "suggestion to the jury to place themselves in the [homeowners'] shoes."[5]  The court

---

- "Like you just testified, it's not a good feeling to go home where you're supposed to be safe and secure, correct?";

- "I bet you that even when -- for example, when you hear a noise, you start looking out, right, you start getting a feeling, right, that maybe somebody's here, right?";

- "So is it safe to say that sometime time -- you know, when they say time heals a broken heart, that passage of time actually makes things a little bit better?"; and

- "And passage of time makes you look back and reflect as to what actually happened and makes you have a better sense of what actually occurred; isn't that right?"

[5]     The prosecuting attorney mentioned that during closing argument defense counsel had stated "imagine how they felt."  Indeed defense counsel told the jury, "Imagine yourself in [the homeowner's] position driving home with children in your van."

affirmed its ruling.  It believed that the jury instructions, including a command to avoid being influenced by passion or prejudice, would ensure fairness.[6]

"Wasn't me" was Riveira's defense.  It was a case of misidentification, he argued.  Riveira did not testify.  Through cross-examination, Riveira hoped to undermine the homeowner and neighbor's identifications.  He also questioned the State's police officer witnesses regarding the burglary investigation, field show-up procedures, and truck search.  Highlighting the lack of fingerprint evidence, the defense stressed in closing argument the absence of direct evidence showing that Riveira entered the home.

The deputy prosecuting attorney questioned defense counsel's truthfulness during rebuttal argument.  He told the jury: "the folks [defense counsel is] trying to <u>trick</u> are you

---

[6]    Before the parties' closing arguments, the court read a series of jury instructions, including:

- "Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence.";

- "Keep in mind, however, that closing arguments are not evidence, okay.  What the attorneys say in closing arguments do not constitute evidence, all right."; and

- "You must not be influenced by pity for the defendant or by passion or prejudice against the defendant."

with his interpretation of the evidence."[7]  (Emphasis added.)
Defense counsel failed to object.

The jury found Riveira guilty of burglary in the first
degree.[8]

## II.

Riveira challenges several remarks the deputy prosecuting
attorney made during closing argument.  Prosecutorial
misconduct, he contends, necessitates vacating his conviction.
We find two instances worthy of review: (1) the prosecuting
attorney's references to the burglary's impact on the
homeowner's household, followed by a plea to hold Riveira
accountable "for what he did to that family"; and (2) the
prosecuting attorney's comment accusing defense counsel of
trickery.

The State concedes that these remarks were improper.[9]  But
it argues that they were not reversible prosecutorial

---

[7]     The prosecuting attorney prefaced his remark by referring to defense
counsel's comment to two prosecution witnesses during cross-examination that
he wasn't trying to trick them.

[8]     The court instructed the jury that it could convict Riveira as a
principal or accomplice.  The court did not give a special interrogatory.  So
whether the jury convicted him as a principal or accomplice is unknown.  On
appeal, Riveira argued that the evidence failed to support an accomplice
instruction.  We agree with the ICA.  It did.

[9]     During oral argument, the State acknowledged: "When we come to the
victim impact testimony, I think it's pretty clear that we shouldn't be
bringing this out in the case in chief or . . . before the jury.  I do find
that [it] . . . would be irrelevant; it is prejudicial."  The State also
recognized that the prosecutor's insinuation that defense counsel attempted
to trick the jury was "something that [prosecutors] shouldn't be doing."

misconduct. We agree.

Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard. State v. Klinge, 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000). After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against the defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome. State v. Senteno, 69 Haw. 363, 366, 742 P.2d 369, 372 (1987) (citing State v. Marsh, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986)); State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999).[10]

The nature of the challenged conduct – what it was and how it entwined with the whole case – starts the inspection. Beginning with the first allegation of prosecutorial misconduct, injecting victim impact evidence into the trial and touting that evidence to hold the defendant accountable for what he did to the victim's family amounted to severe misconduct.

---

[10] If a defendant fails to object to a prosecutor's improper conduct, "appellate review is limited to a determination of whether the prosecutor's alleged misconduct amounted to plain error" that affected the defendant's substantial rights. State v. Iuli, 101 Hawai'i 196, 204, 65 P.3d 143, 151 (2003). In determining plain error relating to prosecutorial misconduct, courts have considered the same three factors. Id. at 208, 65 P.3d at 155.

Victim impact evidence concerns a crime's effect on the person harmed by the crime or others, especially the person's family members. It includes evidence regarding the physical, psychological, or economic effect of a crime. See Hawaiʻi Revised Statutes (HRS) § 706-602(1)(c) (2014) (instructing that victim impact statements in the sentencing context include "any physical or psychological harm or financial loss suffered").

During a trial, a crime's after-effects are rarely allowed. Hawaiʻi Rules of Evidence (HRE) Rules 401, 403.[11] In State v. Lora, 147 Hawaiʻi 298, 307-09, 465 P.3d 745, 754-56 (2020), this court disallowed victim impact evidence to counteract a cross-examination undermining a witness's credibility. "We reject[ed] an approach that would permit the admissibility of the impacts of an alleged offense on a complaining witness in order to bolster the witness's credibility after it has been impeached or attacked." Id. at 309, 465 P.3d at 756. While observing that impact evidence is generally irrelevant to a defendant's guilt, we recognized that establishing an element of a crime could

---

[11]    Sentencing hearings, by contrast, routinely feature victim impact testimony. HRS §§ 706-602(1)(c), 706-604(3) (Supp. 2016). "The victim impact statement is often made a part of the [presentence report] and the victim or the victim's family is given the opportunity to be heard in open court at the hearing itself." State v. Hussein, 122 Hawaiʻi 495, 523, 229 P.3d 313, 341 (2010).

justify the prosecution's introduction of the evidence.  Id. at 309, n.14, 465 P.3d at 756, n.14.[12]

Here, the prosecution's narrative arc promoted evidence spotlighting the crime's impact on the homeowner's family.  The prosecution flanked its case with commentary regarding the burglary's aftermath.  During opening statement, the deputy prosecuting attorney introduced the theme: "the evidence will show that [the family] lost their sense of security and ability to feel safe in their home."

To back its promise, the prosecution asked the eyewitness homeowner how the burglary made her feel.  She felt "very violated," experienced a "very personal feeling" because the burglary happened in her home where her children slept, was "very concerned" for her family's safety, had difficulties sleeping, and hid the family's electronics when she left home.  She ended her answer by saying that the crime "affected [her] deeply."

The prosecution also called the homeowner's husband to testify.  The State asked him a few questions about consent,

---

[12]    See Hartwell v. State, 476 S.W.3d 523, 535 (Tex. Ct. App. 2015) (holding that questions regarding the extent of the victim's injuries were relevant because the state had to prove that she suffered serious bodily injury and the questions did not address the effect of the crime on the victim or her family).  Impeaching a victim's credibility is another purpose justifying victim impact evidence.  See Lora, 147 Hawaiʻi at 309, n.14, 465 P.3d at 756, n.14 (observing that impact evidence can be introduced at trial "to impeach a victim's credibility").  Like all evidence, this purpose must satisfy HRE Rules 401 and 403.

though the homeowner later established the same point.  The deputy prosecuting attorney then asked, "how did it make you feel after you had learned that you had been burglarized?"  "Violated," he told the jury.

At the trial's end, the prosecuting attorney circled to the opening statement's preview regarding what the case was about – a family's inability to feel safe and secure in their home.  Then, after briefly recapping the evidence, the State had the last word; it urged the jury to "hold the defendant accountable for what he did to that family and find him guilty as charged of Burglary in the First Degree."

The victim impact testimony presented and highlighted by the prosecution lacked probative value.  Riveira claimed he was misidentified.  The prosecution said he was not.  The homeowners' post-event feelings and actions did not help prove an element.  The crime's aftermaths did not have a tendency to make a fact of consequence more or less probable.  HRE Rule 401[13] should have blocked the testimony.

The victim impact testimony's highly prejudicial nature

---

[13]    HRE Rule 401 reads: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

also made it inadmissible under HRE Rule 403.[14]  The evidence generated sympathy for the family and impelled hostility toward Riveira.  See HRE Rule 403 cmt. (recognizing "potential for engendering juror prejudice, hostility, or sympathy" as a factor in Rule 403 determinations).  The need for the victim impact evidence was nil.  By contrast, the testimony had great potential to unfairly prejudice Riveira.

Complicating the case slightly, the defense failed to make evidentiary objections.[15]  This mattered to the ICA.  Because admitting the victim impact testimony from the eyewitness homeowner and her husband was not plainly erroneous, the ICA determined, the deputy prosecuting attorney's "brief" comment about the testimony during closing argument was not reversible prosecutorial misconduct.  Although we agree with the ultimate

---

[14]    HRE Rule 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[15]    The ICA observed that the State did not directly rebut the defense's appellate argument maintaining that the victim impact testimony was irrelevant and highly prejudicial.  Instead, the State argued — and the ICA agreed — that admitting the impact testimony did not amount to plain error because it was "a result of trial strategy."  Although we agree that admitting the irrelevant testimony was not plainly erroneous, we disagree with the ICA's rationale.  The ICA concentrated on defense counsel's decision to ask the homeowner questions about the burglary's impact during cross-examination.  It believed the failure to object was a conscious decision, designed to challenge the reliability of the homeowner's identification.  This reasoning is unpersuasive.  Defense counsel's meandering cross-examination questions about the burglary's impact, see supra n.4, didn't touch the homeowner's identification.  And it makes little sense that defense counsel strategically greenlighted highly prejudicial testimony so that he could query the victim about that highly prejudicial testimony.

conclusion, this determination understated the centrality that the inadmissible victim impact testimony played in the State's case.

When reviewing the nature of prosecutorial misconduct, courts should inspect how the prosecution entwined its improper conduct within the case's contextual fabric. See State v. Uyesugi, 100 Hawai'i 442, 460, 60 P.3d 843, 861 (2002) (focusing in part on "whether and how [surviving family members'] testimony was woven into the case" when analyzing whether the testimony "inflame[d] the jury to the extent that the jury [was] diverted from its objective considerations").

Here, the prosecution previewed, injected, and highlighted how the burglary affected the homeowner's family. Asking the jury to hold Riveira accountable for what he did "to that family" did not merely conjure up the evidence about the burglary. The prosecution's entreaty likely evoked an emotional reaction from the jury; it emphasized the crime's effect on the family. The way the State infused the irrelevant impact evidence into its case and rebuttal argument amplified the evidence's prejudicial effect. See Lora, 147 Hawai'i at 310-11, 465 P.3d at 757-58 ("The admission of [the erroneously admitted] testimony, the manner in which it was presented by the [prosecution], and the reliance upon it during closing argument all demonstrate that this error was highly prejudicial.").

The second instance of prosecutorial misconduct happened when the deputy prosecuting attorney denounced defense counsel for trying to deceive the jury: "the folks [defense counsel is] trying to <u>trick</u> are you with his interpretation of the evidence."  (Emphasis added.)  The ICA downplayed the prosecution's conduct; it deemed the error "not of a repeated nature."

Impugning defense counsel's principles is serious misconduct.  It undermines a trial's fairness "because it is a strik[e] at the [defendant] over the shoulders of his counsel in an attempt to prejudice the jury against the [defendant]." <u>State v. Underwood</u>, 142 Hawaiʻi 317, 327, 418 P.3d 658, 668 (2018) (internal quotation marks and citation omitted); <u>see also</u> <u>State v. Pasene</u>, 144 Hawaiʻi 339, 370, 439 P.3d 864, 895 (2019) ("A prosecutor's comment is clearly misconduct where it constitutes an impermissible attack on defense counsel's integrity and operates to denigrate the legal profession in general." (cleaned up)).  Accusing defense counsel of trying to "trick" the jury fits this mold.[16]

We conclude that both sets of improper remarks amounted to serious misconduct.

---

[16]    Defense counsel's offhand references during cross-examination of two prosecution witnesses that he was not trying to trick them, <u>see</u> <u>supra</u> n.7, do not validate a declaration to the jury that counsel was trying to manipulate them.

Next, under the second factor examining claims of reversible prosecutorial misconduct, we consider whether the court gave prompt curative instructions. Here, the trial court did not give curative instructions. The defense did not object to the inadmissible victim impact evidence; it also did not object to the "trick" comment. A curative instruction's probability drops without an objection. An instruction would only be given if the trial court stepped in. But like here, trial courts often do not intercede. Because the putative misconduct lingers unimpeded by objection and curing, the second factor rewards sloppy defense work; it seemingly makes a successful appeal easier in a plain error prosecutorial misconduct case.

Even if the defense had objected and the court had given a mitigating instruction, the instruction would not have remedied the misconduct's prejudicial effects. Court instructions often serve as an unsatisfactory, ineffectual fix when prejudicial matters surface at trial. See Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) (citation omitted) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . [is] unmitigated fiction.").

The State argued that the trial court's general instructions, like directing the jury not to be influenced by

17

passion or prejudice, cured any prejudice caused by the prosecuting attorney's improper remarks. We disagree. The general instructions given to Riveira's jury before closing arguments did not neutralize the prosecutor's harmful conduct. See Underwood, 142 Hawai'i at 327-28, 418 P.3d at 668-69 (holding that an instruction stating, "[s]tatements or remarks made by counsel are not evidence," was "an ineffective remedy to the improper remarks" partly because it was general in nature and was delivered to the jury along with many other standard instructions before closing arguments began).

The case's resolution then pivots on the strength of the evidence showing Riveira's guilt. "When evidence is so overwhelming as to outweigh the inflammatory effect of the improper comments, reviewing courts will regard the impropriety as ultimately harmless." State v. Williams, ___ Hawai'i ___, 491 P.3d 592, 607 (2021) (citation omitted). We conclude that the evidence against Riveira was sufficiently overwhelming. There was no reasonable possibility that the misconduct contributed to the trial's outcome.

Two eyewitnesses placed Riveira at or near the burglarized home minutes before and after the burglary. The homeowner saw the burglar running away in her backyard. She also saw a red Toyota Tundra truck parked next to her mailbox. She described the suspect and the truck to the 911 operator. At trial, the

homeowner detailed the burglar's physical features (his heavy-set body and short hair). She also remembered his distinctive attire (a neon construction shirt, plaid shorts, and dark boots). She later identified Riveira at the field show-up as the person she saw running in her backyard based on his heavy-set build, plaid shorts, and dark boots. The homeowner told the jury that she saw a boot print in her house after the burglary.

The neighbor largely corroborated the homeowner's testimony. He said that he spotted a red Toyota Tundra truck and a man sitting in it about ten minutes before the homeowner saw the burglar. He described the suspect as having short hair and wearing a yellow construction shirt, similar to what the homeowner observed. The neighbor later identified Riveira partly based on his tattoos. The jury saw Riveira's arrest photograph. It fairly matched both eyewitnesses' descriptions.[17]

The State presented other evidence connecting Riveira to the crime. The homeowner saw the burglar carrying a black object with cords hanging from it. The stolen items - the homeowner's black laptop with its cord and her children's gaming

---

[17] We recognize the perils of eyewitness identifications. See State v. Kaneaiakala, 145 Hawai'i 231, 233, 450 P.3d 761, 763 (2019) (quoting United States v. Wade, 388 U.S. 218, 228 (1967)) (observing that "[t]he vagaries of eyewitness identification are well-known; [and] the annals of criminal law are rife with instances of mistaken identification"). Here, the trial court directed the jury to determine "whether an eyewitness gave accurate testimony regarding identification"; it instructed the jury based on Hawai'i Pattern Jury Instruction - Criminal 3.19, listing thirteen factors to consider in evaluating identification testimony.

devices - were found in the truck that the police stopped.  The police did so because its license plate matched the alphanumeric information recited by the homeowner.  Riveira was in that truck, along with the female suspect.  And officers recovered his photograph from the truck.  After reviewing the record, we conclude that the State presented overwhelming evidence establishing Riveira's guilt.

Serious prosecutorial misconduct invaded Riveira's trial.  But considering the strength of the evidence against Riveira, we hold that the misconduct had no reasonable possibility of contributing to his conviction.  The misconduct was harmless beyond a reasonable doubt.[18]

### III.

We affirm the ICA's judgment on appeal and the circuit court's judgment of conviction and sentence.

| | |
|---|---|
| Harrison L. Kiehm, for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Stephen K. Tsushima, for respondent | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| | /s/ Todd W. Eddins |



---

[18]     The defense failed to object to the comment disparaging defense counsel.  So it is reviewed for plain error.  Because we hold that this remark was harmless, it cannot be plain error.  See State v. Ui, 142 Hawaiʻi 287, 297, 418 P.3d 628, 638 (2018) (internal quotation omitted) (observing that "a reviewing court has discretion to correct plain error when the error is not harmless beyond a reasonable doubt").