**Electronically Filed
Supreme Court
SCWC-20-0000689
31-OCT-2022
09:11 AM
Dkt. 13 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

CHANSE HIRATA,
Petitioner/Defendant-Appellant.

SCWC-20-0000689

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000689; CASE NO. 1FFC-18-0000756)

OCTOBER 31, 2022

McKENNA, WILSON, AND EDDINS, JJ.; AND RECKTENWALD, C.J.,
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY EDDINS, J.

A jury found Chanse Hirata guilty of violating Hawai'i

Revised Statutes § 707-733.6 (2014), continuous sexual assault

of a minor under the age of fourteen years.

Hirata wants a new trial. He argues two of the deputy

prosecuting attorney's closing argument remarks prejudiced his

right to a fair trial: (1) Hirata had "a motive to lie"; and (2) the complaining witness (CW) testified "consistent with a child who is traumatized."

We hold that each of these remarks constitute misconduct, and that neither was harmless beyond a reasonable doubt.

We vacate Hirata's conviction and remand the case to the trial court.

## I.

The deputy prosecuting attorney's (DPA) opening statement previewed the State's theory of the case. The case turned on CW's credibility.

> Now, ladies and gentlemen, during the course of this trial, you will not be presented with DNA evidence, you will not be presented with surveillance videos, you will not be presented with eyewitnesses, because there is none. But you will hear from the one person that lived through all of this. You'll hear from [CW].

CW testified. The State also presented testimony from her parents, a police officer, a detective who interviewed CW, a doctor who examined CW, and an expert in the dynamics of child sexual abuse.

Hirata, his parents, and his girlfriend testified for the defense.

Both the prosecution and the defense acknowledged that the case hinged on the jurors' assessments of Hirata and CW's relative credibility.

The DPA's closing argument circled back to the theme introduced in her opening statement.  The jury's decision "comes down to one question, is [CW] believable?"  The DPA continued: "the answer is clear to this question.  Yes [CW] is believable."  Then to support CW's credibility, the DPA explained that her "brave" testimony is "consistent with a child who is traumatized."

The DPA began her closing argument:

> [DPA]: Now, at the beginning of this trial I told you you were not gonna hear about DNA evidence.  You weren't gonna see surveillance videos.  You weren't gonna hear from eyewitnesses because in a case like this, there is none.  But you would hear from the one person that lived through it, and at the end of this, it comes down to that one person, comes down to [CW].  <u>And it also comes down to one question, is [CW] believable?</u>
>
> Now, the Court gave you the jury instructions that you all have in front of you, and on page 8, there are a list of factors that you can consider when you deliberate to determine if a witness is credible.  So you look at their demeanor, their candor, lack of motive, and if what they say makes sense.
>
> So when you look at the factors – and I'll go through them with you, ladies and gentlemen – the answer is clear to this question.  Yes, [CW] is believable.  And because [CW] is believable, it's – it is the testimony that has a convincing force upon you that counts, and the testimony of even a single witness, if believed, can be sufficient to prove a fact.
>
> So let's go through the factors of [CW]'s credibility.  Her appearance, demeanor, her manner of testifying.  She came here last week.  You saw her.  She's 11 years old.  She was nervous and understandably so.  And she tried to be brave up there on the stand.  She answered all of my questions.  She answered all of the defense attorney's questions.  Almost three hours up there.
>
> And then at the end of almost those three hours, she couldn't be brave anymore, and you saw her when she got emotional.  She broke when the defense attorney continued to call – to question her credibility and if she was making this up, and her answer to you was this really happened.  <u>It's consistent with a child who is traumatized.</u>

3

(Emphases added.)

The court's jury instruction on credibility listed the factors the DPA referenced. Before the closing arguments, the court read this standard instruction about witness credibility. See Hawai'i Standard Jury Instructions Criminal (HAWJIC) 3.09.[1] Because Hirata testified, the court also gave the standard instruction directing the jury to treat him like other witnesses.[2] Those instructions allowed the jury to consider Hirata's "interest, if any, in the result of this case" as it evaluated the weight and credibility of his testimony.

---

[1]     The parties agreed to the court's instruction. HAWJIC 3.09 (2000) reads, in part:

> It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

(Emphasis added.)

[2]     HAWJIC 3.15 (2012) instructs:

> The defendant in this case has testified. When a defendant testifies, his/her credibility is to be tested in the same manner as any other witness.

During her closing, the DPA spotlighted the court's instructions: the jury had to assess Hirata's credibility just like that of the other witnesses and could consider his interest in the case's result.  Then the DPA declared that none of the defense's witness – Hirata included - could be believed because "[t]hey have a motive to lie":

> Additionally, the <u>defendant also testified</u>, and the jury instructions say that when a defendant testifies, <u>his credibility is to be tested in the same manner as any other witness</u>.  So we still need to use – or you still need to use those factors on page 8.
>
> So is the defense's story believable?  We look at the same factors.  They have bias.  <u>They have a motive to lie</u>.  What they said doesn't make sense, and at times, they even contradicted each other.  The defense's story is not believable.  The defense's story is not believable, and this is what their story is.

(Emphases added.)

The jury found Hirata guilty as charged of continuous sexual assault of a minor under the age of fourteen years.  Hirata appealed.

In a Summary Disposition Order, the ICA held that the DPA improperly undermined Hirata and his witnesses' testimony by saying they had a motive to lie.  But, it said, this misconduct was harmless because "[t]he evidence against Hirata was overwhelming."  The ICA did not address Hirata's argument that the prosecutor crossed the line by claiming the CW testified "consistent with a child who is traumatized."

5

In his cert application, Hirata presents a single question: "Whether the ICA gravely erred in holding that the misconduct by the DPA was harmless beyond a reasonable doubt and did not violate Hirata's constitutional right to a fair trial?"

## II.

Hirata did not object to the DPA's closing argument, so his appeal is subject to plain error review.[3]

We apply the plain error standard of review "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." State v. Williams, 146 Hawaiʻi 62, 72, 456 P.3d 135, 145 (2020).

Prosecutorial misconduct claims concern violations of the right to a fair trial. That's a fundamental right. See State v. Williams, 149 Hawaiʻi 381, 392, 491 P.3d 592, 603 (2021) ("The constitutions of the United States and the State of Hawaiʻi guarantee every individual accused of a crime the fundamental right to a fair trial.").[4]

---

[3] The issues were briefed by the parties on appeal as required by Hawaiʻi Rules of Appellate Procedure Rule 28(b)(4)(D) (2022).

[4] See also State v. Yoshino, 50 Haw. 287, 290, 439 P.2d 666, 668–69 (1968) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. . . . To perform its high function in the best way justice must satisfy the appearance of justice." (cleaned up)) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

Because prosecutorial misconduct impacts the fundamental right to a fair trial, there is no difference between the plain error and harmless beyond a reasonable doubt standards of review.  See State v. Riveira, 149 Hawaiʻi 427, 431 n.10, 494 P.3d 1160, 1164 n.10 (2021) (observing that "courts have considered the same three [harmless beyond a reasonable doubt] factors" when considering prosecutorial misconduct claims under plain error review).

In prosecutorial misconduct cases, then, once the defense establishes misconduct - objection or no objection - appellate review is the same: "After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against the defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome."  Id. at 431, 494 P.3d at 1164.

## III.

Both the motive-to-lie remark and the prosecutor's claim that CW testified "consistent with a child who is traumatized" were prosecutorial misconduct.

To the extent the motive-to-lie remark concerns Hirata's testimony (as opposed to that of his parents and girlfriend), it is misconduct because it suggests that Hirata had a motive to

lie without presenting *any* evidence in support of that claim other than Hirata's party status.[5]

Our caselaw forbids "arguments that are uncoupled from evidence showing the defendant has a particular interest in the outcome separate from the generic interest shared by all defendants in criminal cases." State v. Salavea, 147 Hawai'i 564, 585 n.29, 465 P.3d 1011, 1032 n.29 (2020).[6] Our law is

---

[5] The DPA's motive-to-lie remark is also misconduct because of its use of the word "lie" in connection with the testimony of Hirata's mother, father, and girlfriend. A prosecutor's use of the verb *lie* when linked to witness credibility is improper. "The word's strongly pejorative tone conveys the speaker's subjective disapproval that the witness would taint the judicial process with dishonesty." State v. Austin, 143 Hawai'i 18, 51, 422 P.3d 18, 51 (2018) (Pollock, J., concurring in part). Prosecuting attorneys must scrub *lie* and its derivatives from their closing argument vocabulary. See id. at 56, 422 P.3d at 56 (barring the use of "lie" to describe a witness's testimony to "allay[] the uncertainty of counsel and trial courts otherwise tasked with determining when the use of the term crosses the line . . . into actual impropriety" (cleaned up)).

The ICA correctly ruled the DPA's motive-to-lie remark improperly impugned the defense witnesses' testimony. This is true even though the DPA didn't say that mother, father, and girlfriend *lied*, just that they had "a motive to lie." Saying a person has a motive to lie implies an opinion that the person has lied. Cf. id. at 51, 422 P.3d at 51 (explaining that "the prosecutor's statement that [defendant] 'lied to you' was functionally equivalent to 'I think [defendant] lied to you'"). We also agree with the ICA that, to the extent this inappropriate remark concerned the credibility of Hirata's parents and girlfriend (and not Hirata himself) it was harmless error because there is not a reasonable possibility that, standing alone, it would have impacted the trial's outcome. This case depended on the jury's credibility determinations regarding CW and Hirata.

[6] The ICA cited Salavea in holding that the DPA's motive-to-lie argument was an improper credibility attack because it suggested to the jury that Hirata had a motive to lie simply because he was the defendant and didn't "refer to any specific facts or evidence showing that Hirata had a motive to lie." Implicit in the ICA's decision was the notion that a juror might reasonably believe the DPA linked her "they had a motive to lie" remark to Hirata. During her closing the DPA mentioned the defense witnesses' testimony. Next she referenced the court's credibility instruction, saying that Hirata's "credibility is to be tested in the same manner as any other witness." Then the DPA immediately asked the jury: "So is the defense's story believable? We look at the same factors. They have bias. They have a motive to lie." The order of operation: mentioning mother, father, and

clear: prosecuting attorneys "cannot ask the jury to infer a defendant's lack of credibility based solely on the fact that [they are the] defendant." State v. Basham, 132 Hawai'i 97, 117, 319 P.3d, 1105, 1125 (2014).

In both Basham and Salavea, we gave defendants new trials when the prosecuting attorneys suggested they had a "motive to lie" to the police (in Basham[7]) and to the jury (in Salavea[8]).

Here, the State argues that unlike in Basham and Salavea, the prosecuting attorney discussed specific evidence justifying its claim that Hirata had a motive to lie: "When discussing[] Hirata's credibility," the DPA "argued that Hirata's testimony contradicted other witnesses' testimony."[9]

_____

girlfriend, next referencing the jury instruction concerning Hirata's credibility, and then saying "They have a motive to lie," clearly conveys to the jury that Hirata is one of the people with a motive to lie. The State's briefing does not argue otherwise.

[7]    In Basham, we said that the prosecuting attorney's statement that Basham – who unlike Hirata did not testify in his own defense - had a motive to lie to the police expressed "a personal view on the credibility of the State's witnesses and the guilt of the defendants." 132 Hawai'i at 115, 319 P.3d at 1123. Basham received a new trial.

[8]    In Salavea, the prosecuting attorney argued that the testifying defendant lacked credibility because she had a "motive to lie." Yet as in Basham, the DPA did not explain the defendant's alleged "motive to lie." The DPA referenced no specific facts or evidence. There was nothing behind the prosecutor's motive-to-lie remark aside from the interest all defendants have in avoiding conviction. Salavea received a new trial. 147 Hawai'i at 584-85, 465 P.3d at 1031-32.

[9]    Excluding an eight-page reproduction of the DPA's summation, the argument section in the State's answering brief omits the words "motive to lie." And this section only mentions one quote from one case, Salavea: "Prosecutors may . . . cite to specific facts or evidence indicating the lack of trustworthiness of the witness or defendant when discussing a witness or defendant's testimony during summation."

9

This argument makes no sense.

There is no logical relationship between the claim that Hirata's testimony contradicted that of other witnesses and the claim that Hirata had an interest in lying on the stand. Discussing inconsistencies or discrepancies between witnesses is a traditional evidence-based method to undercut credibility. But that routine credibility attack does not provide an evidentiary bridge to support a motive-to-lie comment.

Here, there were no specific facts or evidence to justify the DPA's credibility attack, only Hirata's defendant status could explain the remark. So the prosecutor's comment was misconduct.

The State also attempts to justify this misconduct on the grounds that it was made "in light of the jury instruction regarding credibility." But this argument fails: far from justifying the prosecutor's motive-to-lie remark, the court's use of a credibility instruction identical to HAWJIC 3.09 and the DPA's references to that instruction during closing *aggravated* the motive-to-lie misconduct.

This court flagged a potential pitfall with HAWJIC 3.09 in Salavea. In that case, this court considered whether Basham's holding – a prosecutor cannot undermine a defendant's credibility based solely on party status – was inconsistent with HAWJIC 3.09. Salavea concluded that there was no inconsistency

*when the prosecutor supports the inference that the defendant lacks credibility with non-status evidence*. But it did not condone the use of HAWJIC 3.09's "interest, if any, in the result of this case" clause in the way more common situation where there's no evidence *other than* a defendant's status as defendant to support a credibility attack. Salavea, 147 Hawai'i at 585, 465 P.3d at 1032.

Here, the DPA committed misconduct when she stated Hirata had a motive to lie based solely on his party status. This misconduct was amplified by the DPA's references to a credibility instruction that, by its terms, generically attacks the credibility of testifying defendants[10] and, in doing so, "transform[s] a defendant's decision to testify at trial into an automatic burden on credibility." Basham, 132 Hawai'i at 118, 319 P.3d at 1126 (cleaned up). Given the risk that HAWJIC 3.09 poses to defendants' due process right to a fair trial, we direct trial courts to excise HAWJIC 3.09's "interest, if any,

---

[10] In our courtrooms the trial judge reads the jury instructions, most jurors read along, and all jurors take the instructions to the jury room. Then jurors at some point consult the credibility instruction to fact find. In most trials, HAWJIC's 3.09's "interest in the result of this case" clause deflates a testifying defendant's credibility. The instruction invites jurors to disbelieve a testifying defendant for no reason other than their interest in the result of the case, their status as Defendant. And this is wrong. Attacking a defendant's credibility with remarks "uncoupled from evidence showing the defendant has a particular interest in the outcome separate from the generic interest shared by all defendants in criminal cases" is misconduct. Salavea, 147 Hawai'i at 585 n.29, 465 P.3d at 1032 n.29.

in the result of this case" clause when a defendant testifies and there's no specific evidence to support a credibility attack other than the universal interest in the result of the case shared by all defendants.[11]

The DPA's remark that the CW testified "consistent with a child who is traumatized" was also misconduct.[12]

A prosecuting attorney has a duty to seek justice, to play fair and square. A prosecuting attorney's words have an outsized influence on a jury. For this reason, this court has often directed prosecutors to not express personal beliefs about the evidence. See, e.g., State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986) (stating that prosecutors must "refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses").

Prosecutors are also forbidden from introducing new information or evidence in closing argument. See Basham, 132 Hawai'i at 113, 319 P.3d at 1121 ("Closing arguments are not the

---

[11]   The HAWJIC 3.09 clause "all other circumstances surrounding the witness and bearing upon his or her credibility" covers other "interests" that are useful to evaluating the credibility of a witness and the weight to be given to their testimony. We suggest the Standing Committee on Pattern Criminal Jury Instructions rethink HAWJIC 3.09, an instruction that has not been updated for over twenty years.

[12]   The ICA's Summary Disposition Order did not address this point of error. Hirata's "Statement of Point of Error" in his opening brief identifies the misconduct he alleges, including the "consistent-with-a-child-who-is-traumatized" remark. And his opening and reply briefs urge reversal because of this remark. Hirata's application for certiorari highlights the ICA's omission regarding this point of error.

place to introduce new evidence outside the safeguards of the Hawai'i Rules of Evidence."). We have explained that "expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate an attorney from the cause being argued." Salavea, 147 Hawai'i at 582, 465 P.3d at 1029.

Here, the jury heard the DPA opine that the CW testified "consistent with a child who is traumatized." But it heard no *evidence* that could legitimately support the prosecutor's claim that the CW testified consistent with a traumatized child.[13] No witness testified about CW's mental health or psychological condition.[14]

The DPA improperly expressed her personal belief about CW's credibility and injected new evidence by explaining to the jury that CW's testimony is "consistent with a child who is traumatized." Her unsupported comment invited the jury to infer that she had undisclosed information about CW's mental health, information that could corroborate a trauma-inducing event like

---

[13]   Nor in most cases could they. See Riveira, 149 Hawai'i at 431, 494 P.3d at 1164 (explaining that testimony about "a crime's after-effects are rarely allowed" because the information is both irrelevant and highly prejudicial).

[14]   The state's expert testified generally about delayed disclosure, "tunnel memory," and other dynamics of child sexual abuse. But the expert supplied no evidence about post-abuse "trauma" or how traumatized children act or testify in court. The expert was also unfamiliar with CW or the case's factual scenario.

the charged crime.  We hold that the DPA's remarks constituted serious prosecutorial misconduct.

**IV.**

Having determined that both of the challenged remarks constitute prosecutorial misconduct, we turn now to determining whether there is a reasonable possibility that this misconduct "might have affected the trial's outcome."  See Riveira, 149 Hawai'i at 431, 494 P.3d at 1164.

Typically, a trial ends one of three ways: with a guilty verdict, a not guilty verdict, or a hung jury mistrial.  So a prosecutor's improper remarks affect the trial's outcome if there's a reasonable possibility that at least one juror might have been affected by the misconduct: it just takes one unconvinced juror to hang a jury.  The reasonable possibility standard, then, is satisfied if there's a showing that it's reasonably possible that, absent the misconduct, a single juror would have voted differently.

We have historically considered three factors in applying this standard: (1) the nature of the prosecuting attorney's misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id.

Here, however, our analysis will focus on the first and third factors.  Put differently, the lack of a curative

14

instruction, though technically a consideration that should weigh in Hirata's favor, does not impact our analysis of whether there's a reasonable possibility that either of the DPA's remarks impacted the trial's outcome.

The importance of the second factor — promptness or lack of a curative instruction — pales in comparison to that of the first and third factors for two reasons.

First, curative instructions are not particularly effective. See id. at 433, 494 P.3d at 1166 (recognizing that "[c]ourt instructions often serve as an unsatisfactory, ineffectual fix when prejudicial matters surface at trial"). Often, even if a curative instruction is given, its effect is minimal.

Second, because curative instructions are less likely without an objection, giving great weight to the promptness or lack of a curative instruction factor in assessing harmless error makes "a successful appeal easier in a plain error prosecutorial misconduct case." Id. And, in doing so, it may even disincentivize defendants from objecting at trial. We are thus disinclined to "reward" defendants for failing to object at trial by giving significant weight to the resultant lack of a curative instruction.

To be sure, a strongly-worded admonition immediately following minor prosecutorial misconduct may mitigate the

effects of that misconduct on the trial's outcome and should be considered.  But in many cases, this one included, the first and third factors of the harmless error analysis are primary.

**A.**

There is a reasonable possibility that the DPA's motive-to-lie remark affected the outcome of Hirata's trial.

We view unfounded allegations that a defendant has a "motive to lie" as extreme misconduct.  The suggestion that a defendant's party status might motivate dishonesty – no matter how veiled — meddles with defendants' constitutional rights to testify and not to testify.

The choice to testify, or not, is the biggest decision a defendant makes at trial.  Our courts do a lot to ensure this crucial call is made knowingly, intelligently, and voluntarily.[15] Knowing that the prosecuting attorney can generically attack credibility may impermissibly alter defendants' calculus about which constitutional right to choose.[16]

---

[15] See e.g. State v. Lewis, 94 Hawai'i 292, 293, 12 P.3d 1233, 1234 (2000) (describing the comprehensive colloquy - designed to protect the right to testify and the right not to testify - that happens before the start of trial and at the end of trial).

[16] See Basham, 132 Hawai'i at 118, 319 P.3d at 1126 (Impugning credibility because a defendant has a motive to lie "discourage[s] a defendant from exercising [their] constitutional right to testify on [their] own behalf.").

See also id. at 116, 319 P.3d at 1124 (identifying the constitutional rights diluted by a motive or interest comment directed at testifying defendants and observing that the tactic "impinges upon fundamental principles of our system of justice, including the presumption of innocence,

As we put it in <u>Austin</u>:

> Because such an argument can be asserted indiscriminately as to <u>any</u> defendant, regardless of the evidence, it is completely unhelpful to the finder of fact.  Moreover, arguing that the testimony of defendants should <u>inherently</u> be doubted contradicts the presumption of innocence — a foundation of our criminal justice system.  That is, a contention that defendants are inherently motivated to lie effectively places the burden on defendants to prove they are testifying truthfully, which also has a chilling effect on the constitutional right to testify.

143 Hawai'i at 56 n.12, 422 P.3d at 56 n.12.

In this case, not only did the DPA launch a generic credibility attack, but the DPA told the jury Hirata has a motive to *lie*.  The comment is not a rhetorical device or fair commentary on the evidence.  Rather it's an improper courtroom epithet.  See <u>Austin</u>, 143 Hawai'i at 51, 422 P.3d at 51 ("[t]he word's strongly pejorative tone conveys the speaker's subjective disapproval that the witness would taint the judicial process with dishonesty, effectively coupling an assertion of the speaker's opinion with the factual contentions that are innate in the word 'lie'").

In cases like this one, where the misconduct was the improper suggestion that a testifying defendant had a "motive to lie," and decisions about the "strength or weakness of the evidence against the defendant" hinge entirely on credibility assessments, there will *always* be a reasonable possibility that

---

the burden of proof upon the government, the right to testify without penalty, and the right to a fair trial with an unbiased jury").

the misconduct affected the trial's outcome.  We need not even look at "the promptness or lack of a curative instruction."  It doesn't matter.  In a case that turns on credibility, the mere suggestion that a defendant was untruthful *because of their interest in avoiding conviction* necessarily affects the outcome of the trial.

Turning to the DPA's consistent-with-a-child-who-is-traumatized misconduct, we find that it too, standing alone is reasonably likely to have affected the trial's outcome.

The State argues the DPA's remarks about CW's credibility were "based on specific evidence adduced at trial considered in light of the jury instruction regarding credibility."  We are unpersuaded.

Prosecutors recap evidence in every closing argument.  This intrinsic feature of summation does not greenlight personal opinions.  We were clear about this in Salavea: "a statement may improperly imply a personal opinion . . . *even if specific facts or evidence are invoked*."  147 Hawai'i at 582 n.23, 465 P.3d at 1029 n.23 (emphasis added).

The DPA's remark exceeds fair commentary on the *evidence*.  Worse, the information resembles prejudicial victim-impact evidence.  See Riveira, 149 Hawai'i at 433, 494 P.3d at 1166.  The DPA effectively hinted she knew something the jury didn't know: CW presently suffers trauma, and CW's demeanor and

testimony match the way victims of child sexual abuse testify. The DPA thus expressed a "personal opinion" that took the "form of unsworn, unchecked testimony." See Basham, 132 Hawai'i at 115, 319 P.3d at 1123.

Because the prosecutor improperly bolstered CW's credibility and, by extension, undermined Hirata's credibility, the nature of the misconduct factor strongly favors reversal.

Turning to the third factor, here, the "strength or weakness of the evidence against the defendant" pivoted on the jury's decisions about CW and Hirata's credibility.

The State's opening statement advanced its theory of the case; that is, believe CW. And in closing the State bookended its theory: "and at the end of this, it comes down to that one person, comes down to [CW]. And it also comes down to one question, is [CW] believable?"

The defense's theory of the case was the inverse: believe Hirata and disbelieve CW.

There was not, as the ICA concluded, "overwhelming" evidence of Hirata's guilt. There was testimony that the jury could believe, or not.

In cases reliant on the jury's credibility findings, misconduct attacking a defendant's credibility or bolstering a complainant's (or critical witness's) credibility is seldom harmless beyond a reasonable doubt. See State v. Underwood, 142

19

Hawai'i 317, 329, 418 P.3d 658, 670 (2018) (explaining that evidence of an offense is not overwhelming "[w]hen a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony").

The DPA enhanced the CW's credibility, and, by extension, drained Hirata's credibility.  Given the evidence presented against Hirata there is a reasonable possibility that the DPA's remark about the CW's testimony, standing alone, contributed to the trial's outcome.

We hold that neither instance of prosecutorial misconduct that occurred in this case was harmless beyond a reasonable doubt.  See Williams, 149 Hawai'i at 397, 491 P.3d at 608 (holding the evidence of guilt was not overwhelming where the complaining witness "was the only witness other than defendant who could describe the actual acts" and that "testimony constituted the most significant evidence against" the defendant).[17]  There is a reasonable possibility that each

_____

[17]    See also State v. Conroy, 148 Hawai'i 194, 205, 468 P.3d 208, 219 (2020) (stating "[o]f significance to a determination of the strength of the prosecution's case is that there were no witnesses to the altercation other than [the defendant] and CW"); State v. David, 149 Hawai'i 469, 481, 494 P.3d 1202, 1214 (2021) (holding that because the defendant's self-defense argument depended on his credibility, the exclusion of the aggressor's blood alcohol concentration levels prevented a fair trial); Salavea, 147 Hawai'i at 580, 465 P.3d at 1027 (finding ineffective assistance of counsel not to elicit evidence of the CW's meth use because the evidence was critical to "'the outcome of the case [which] depended on the credibility' of the CW and [the defendant]"); State v. Tuua, 125 Hawai'i 10, 17, 250 P.3d 273, 280 (2011) (explaining this court's reluctance to hold improper statements harmless "[i]n close cases involving the credibility of witnesses, particularly where there are no disinterested witnesses or other corroborating evidence");

instance of misconduct, standing alone, contributed to the trial's outcome.

## V.

We vacate the ICA's Judgment on Appeal and the circuit court's Judgment of Conviction and Sentence.  The case is remanded to the circuit court.[18]

| | |
|---|---|
| Hayley Y.C. Cheng (Jon N. Ikenaga, on the briefs) for petitioner | /s/ Sabrina S. McKenna<br>/s/ Michael D. Wilson<br>/s/ Todd W. Eddins |



Brian R. Vincent
for respondent

---

State v. Walsh, 125 Hawai'i 271, 297, 260 P.3d 350, 376 (2011) (understanding "when a prosecution's case against the defendant is not overwhelming but turns on the credibility of the defendant, it is likely that the error might have contributed to the conviction"); Marsh, 68 Haw. at 661, 728 P.2d at 1302 (holding "[t]he pivotal issue was the credibility of the witnesses.  The jury had to decide whether to believe the victim or the alibi witnesses.  We cannot conclude beyond a reasonable doubt that the prosecutor's remarks had little likelihood of influencing this critical choice.").

[18]    When the remedy for prosecutorial misconduct is remand, the appellate court has not barred retrial.  The judgment establishes that the misconduct is "not so egregious as to clearly deny [the defendant] a fair trial, and the protections of double jeopardy."  Underwood, 142 Hawai'i at 329, 418 P.3d at 670.  From this point on, for appeals that allege prosecutorial misconduct, the briefs do not need to address the double jeopardy issue first identified in State v. Rogan, 91 Hawai'i 405, 423, 984 P.2d 1231, 1249 (1999).  The appellate court may order supplemental briefing at its discretion.