**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000267
20-OCT-2023
08:03 AM
Dkt. 94 MO**

NO. CAAP-22-0000267

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
ZETH BROWDER, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CASE NO. 3CPC-19-0000486)

MEMORANDUM OPINION
(By: Hiraoka and Nakasone, JJ.,
with Leonard, Presiding Judge, concurring separately)

Defendant-Appellant Zeth Browder (**Browder**) appeals from the March 29, 2022 Judgment of Conviction and Sentence, entered by the Circuit Court of the Third Circuit (**Circuit Court**).[1] Following a jury trial, Browder was found guilty of two counts of

---

[1] The Honorable Robert D.S. Kim presided.

first-degree sexual assault, two counts of third-degree sexual assault, first-degree burglary, kidnapping, and tampering with physical evidence.[2]  Browder was sentenced to thirty years of imprisonment.[3]  He timely appealed.

On appeal,[4] Browder contends that the Circuit Court erred by:  (1) transferring a motion to disqualify or recuse the assigned trial judge to another judge to decide (Browder also challenges the second judge's denial of the motion); (2) violating the First Amendment to the U.S. Constitution and Article I, Section 4 of the Hawaiʻi Constitution by limiting public access to the courtroom; (3) denying Browder's motion to dismiss based on violations of his rights under Hawaiʻi Rules of Penal Procedure Rule 48 and his speedy trial rights; (4) accepting Browder's evidentiary stipulations to admit certain exhibits when the stipulations were not "knowingly, intelligently and voluntarily executed"; (5) finding that there was sufficient evidence adduced at trial to convict Browder of a "supposed knife-point sexual assault"; and (6) giving Hawaiʻi Standard Jury Instructions Criminal (**HAWJIC**) 3.09, the credibility of witnesses instruction.  Browder also contends that (7) his trial counsel was ineffective; and (8) the prosecutor committed misconduct during closing argument based on

---

[2]  The underlying charges in the Indictment arose out of a June 15, 2019 incident in which the Complaining Witness (**CW**) alleged that Browder broke into her camping tent and sexually assaulted her.

[3]  The Circuit Court ran the 10-year terms of imprisonment for the first-degree burglary and kidnapping offenses, consecutive to the 20-year terms of imprisonment for the first-degree sexual assault offenses and the remaining offenses.

[4]  Browder's points of error (**POEs**) do not comply with Hawaiʻi Rules of Appellate Procedure Rule 28(b)(4), which requires the POEs be set forth in "separately numbered paragraphs."  (Emphasis added.)  We have numbered the POEs.

State v. Hirata, 152 Hawaiʻi 27, 520 P.3d, 225 (2022),[5] by arguing that (a) CW's testimony was "consistent with someone who's been traumatized"; and (b) "As to Charge 1, we know that on June 15, 2019 the defendant vaginally penetrated [CW] with his penis."[6]

Browder's last point of error is dispositive.  For the reasons explained herein, we hold that the second challenged remark constituted misconduct that was not harmless beyond a reasonable doubt.  We also conclude that there was sufficient evidence adduced at trial to convict Browder of the sexual assault offenses, and vacate and remand for a new trial.

## I.    BACKGROUND

On July 9, 2019, Browder was charged via Indictment with two counts of first-degree sexual assault, two counts of third-degree sexual assault,[7] and one count each of first-degree burglary, kidnapping, and tampering with physical evidence.

**Trial Proceedings**

Jury trial was held on November 30 through December 1, 2, 7, 8, 9, and 14, and 15, 2021, when the jury returned its verdict.

Browder's defense presented in his opening statement was that the sexual assault never happened.  Browder's trial counsel stated that the case involved "fictitious claims of

---

[5]    Browder was permitted to file his January 12, 2023 Supplemental Brief to raise prosecutorial misconduct based on State v. Hirata.  The Plaintiff-Appellee State of Hawaiʻi (**State**) also filed a Supplemental Brief on January 23, 2023.

[6]    Browder specifically challenges the "we know" argument made in reference to Count 1, first-degree sexual assault for vaginal penetration. We also address a second similar "we know" argument that was made in reference to Count 2, first-degree sexual assault for fellatio, immediately following the initial "we know" argument.

[7]    Browder was initially charged with three counts of first-degree sexual assault, but one count was struck by the State.

sexual assault" by CW, a "rush to judgment" by the police, and that the evidence would contradict CW's "alleged fictitious assault" claim.

**CW's testimony:** CW, who was 80 years old at the time of trial, testified that in June 2019 when she was 78 years old, she visited the Big Island. CW camped for four nights in a tent at Spencer's Beach Camp, located on the Kona side of the Big Island (**Camp**) from Wednesday, June 12, 2019 to Sunday, June 16, 2019. Upon arrival, on June 12, 2019, a male "in his 20's" that CW had just met, whom she later identified as Browder, assisted CW in bringing her items to her tent. That same day, CW also met another individual, "Matthew," who was with Browder. Throughout CW's time at the Camp, CW spoke with Browder multiple times, drove Matthew and Browder to the store to grab ice, and drove Browder to his grandmother's house.

On Friday, June 14th, additional campers arrived at the Camp for the weekend. That Friday night, after falling asleep alone in her tent, CW was suddenly awakened early Saturday morning by "something on [her] back and a large bang . . . and that it felt like a bear." CW described being sexually assaulted and identified Browder as the suspect.[8] The male told

---

[8] CW identified Browder as the suspect as follows:

> A. [(By CW)] Okay. And, um, as -- as that happened I said -- then I realized that it wasn't a bear, but I said, "What do you want?"
>
> Q. [(By Prosecutor)] Now, did you know when you were woken up what was on top of you?
>
> A. Not at first, no.
>
> Q. How was I guess whatever -- whatever [sic] was on top of you, how was that positioned over you while you were in your tent?
>
> A. Totally covering my whole body.

(continued. . .)

4

---

[8](. . .continued)

Q. And you were face down on your stomach?

A. I was face down on my stomach. Yes.

Q. At some point, um, did you -- were you able to figure out what was holding you down?

A. Yes.

Q. How did -- how were you able to make that determination?

A. Because the person said -- he – the person pulled my body up and arched my head back and was trying to put a dark object, a dark hood over my head, but I don't know what it was made of or anything. It was just dark, very dark.

And that made me say or [sic] I couldn't able to breathe. "I can't breathe. I can't breathe."

And the hands of that person came around my neck and held it tight and said, "Put your hand over your eyes and don't move. Don't move or I'm going to kill you. I'm going to kill you." And then he said, "Keep it there."

Q. Now, [CW], did you recognize the voice that was telling you to cover your eyes?

A. Yes.

Q. Did you recognize the voice that told you that they would kill you?

A. Yes.

Q. Whose voice was that?

A. <u>The defendant [(Browder)]</u>.

. . . .

A. . . . And so the only thing that came to my mind is that I opened my fingers a little bit, and I saw that his hair was on the body, his body and I said I thought it was dark.

And then I -- my neck was arched back as the penis was going in and out, and I opened the fingers and I saw a little bit of his face. I don't know if I saw the whole face or what, <u>but it was the same face of [Browder] and it was the voice</u>. . . .

. . . .

(continued. . .)

CW to put her hands over her eyes and to not move, or else she would get killed. The male put his hands over CW's neck, flipped CW over, and demanded that CW put her legs around him. At this point, the male began "penetrating into [CW's] vaginal area" with his penis and CW was "shaking." The male pushed CW's head toward his body, began sucking on CW's breasts, told CW to put her hands on his penis, and put his penis into CW's mouth. CW began to feel "pain all over [her] body[,]" and "felt a sharp object coming into [her] back[,]" but did not see the object. CW's head was pushed into the bottom of the tent, which was on top of small rocks, and her "face felt like it was being smashed." CW could not remember if the male left after the incident, but remembered that she "had to go to the bathroom" due to "leakage" coming from her vaginal area.

After the incident, CW walked to the bathroom and heard the male's voice asking if she was "'leaving.'" CW responded that she was going to the bathroom, continued on to the bathroom, and noticed that the leakage was "urine." After using the bathroom, CW was afraid that the male would kill her, and walked to her vehicle to call her friend in North Carolina. CW could not drive because the gates at the Camp were closed, and she did not call 911 because she was "too shaky." CW, on the advice of her friend, walked toward other campers in an

---

[8](. . .continued)
     Q. When you walked to the bathroom was anybody else, um, any other campers awake?

     A. No.

     Q. Did you hear anyone as you were walking to the bathroom?

     A. I heard [Browder]'s name. <u>I heard [Browder]'s -- not name, [Browder]'s voice</u> and he said, "Are you leaving?"

(Emphases added).

attempt to get closer to other people. CW noticed that all the other campers were sleeping, and she sat on a bench near the other campers' tents. Browder approached CW at the bench and asked if she wanted "'to talk'" and if she was "'going back to [her] tent[,]'" to which she responded "'[n]o.'" Browder eventually left and CW was "too shaky and frozen," and sat at the bench until another camper woke up. CW told the camper that she was "'raped'" and could not move due to fear, and the camper called 911.

**Officers Ayau's and Kailiuli's testimony:** On June 15, 2019, Hawai'i Police Department (**HPD**) officers Robert Ayau (**Officer Ayau**) and Jonathan Kailiuli (**Officer Kailiuli**) testified that they were dispatched to the Camp for a sexual assault type case. Officer Ayau observed CW was "crying," "very emotional[,]" and that she had "scratches" on her cheeks and face. Officer Kailiuli interviewed CW and observed that CW was "under some stress[,]" "distraught," "afraid[,]" and "shooken [sic] up." Based on his interview with CW, Officer Kailiuli identified the suspect as Browder, who had a tent within the same area as CW. Officers Kailiuli and Ayau located Browder sleeping on the "top of [a] picnic table" under his pop-up tent, where they also located a "wooden object sharpened to a point." Officer Kailiuli arrested Browder, informed him of CW's report, and that he was under arrest for sexual assault. There were ten to twelve campers in the area. Browder's tent was "approximately 50 feet" from CW's tent.

**Witness Demotta's testimony:** Witness Michael Demotta (**Witness Demotta**) testified that while at the Camp, she observed CW, Browder, and another older male interacting. On June 14, 2019, Witness Demotta fell asleep at 10:00 p.m. and woke up at approximately 4:30 a.m. the next day, used the bathroom, and

7

observed CW sitting on the picnic table.  Witness Demotta went to the bathroom a second time and after exiting the bathroom, CW "grabbed" her arm and told Witness Demotta about the incident.  CW was "shooken [sic] up" and "[l]ooked like she was crying[.]"  Witness Demotta called 911.

**Detectives Acob's and Delaries's testimony:**  HPD detectives Clarence Acob (**Detective Acob**) and Calvin Delaries (**Detective Delaries**) were assigned to CW's case.  Detective Acob testified that on June 26, 2019, he interviewed CW at the Hilo police station and that she began to "cry."  CW identified Browder from a photo lineup and "again she started to tear[.]"

Detective Delaries met CW at Kona Hospital on the date of the incident, where he observed her crying and shaking.  Detective Delaries directed another detective to obtain Browder's clothes while he was at the Kona police station.  Detective Delaries was informed that Browder did not want to give his underwear.  Detective Delaries checked the surveillance system, where he observed Browder wearing a "black band underneath the paper clothes" given to Browder to wear, after Browder's shirt and shorts had been removed.  Detective Delaries saw Browder "pulling on something by his left hip[,]" holding "something black in his hand[,]" shoving the "black material" down the toilet, and flushing it.  The surveillance footage was not admitted into evidence because "there was some type of technical issue" with retrieving it.

**Nurse Davis's testimony:**  Misty Davis (**Nurse Davis**), a registered nurse and a sexual assault nurse examiner who examined CW on June 15, 2019, testified as an expert in the "examination and treatment of patients of alleged sexual abuse."  Nurse Davis described CW as "tearful" and "shaky" during the

examination.  As part of the examination, Nurse Davis conducted a physical[9] and genital[10] examination of CW.

To assist in her testimony regarding CW's physical examination, Nurse Davis referred to the stipulated photographs taken of CW during the examination.  During the physical examination, CW reported "generalized pain and tenderness" and "pain to the back of her head and neck."  Nurse Davis observed "dried blood" above the lip.  Abrasions[11] were observed on the "cheeks," "upper lip[,]" "bridge of her nose," "left eyebrow[,]" "right shoulder," "right arm[,]" and "right knee."  Abrasions and blunt-force trauma were also observed on the "uvula[,]"[12] "soft palate," and "hard palate[.]"[13]  Bruises[14] were observed on

---

[9]     The physical examination consisted of a "head to toe" examination with the documentation of "areas of injury" and "pain or tenderness," including the "taking [of] photographs."

[10]     The genital examination consisted of the observation of the genital area and the taking of photographs, including the collection of swabs from the genital area.

[11]     Nurse Davis defined an "abrasion" as the "breaking or scraping away of the skin."

[12]     While referring to State's Exhibit 112, a photograph of the interior of CW's mouth, Nurse Davis described the "uvula" as the "little part" "hang[ing] down."

[13]     Referring again to Exhibit 112, Nurse Davis referred to "hard palate" and "soft palate" as areas "inside the mouth."  The record does not reflect exactly how Nurse Davis used the photograph in Exhibit 112 to explain these terms.  We take judicial notice that "hard palate" is defined as "the bony anterior part of the palate forming the roof of the mouth" Hard Palate, Merriam-Webster, https://www.merriam-webster.com/dictionary/hard%20palate (last visited Aug. 30, 2023).  "Soft palate" is defined as "the fold at the back of the hard palate that partially separates the mouth from the pharynx." Soft palate, Merriam-Webster, https://www.merriam-webster.com/dictionary/ soft%20palate (last visited May 31, 2023). See HRE Rule 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[14]     Nurse Davis defined "bruise" as "bleeding" "into the skin due to an injury or blunt-force trauma[,]" which "can be in a variety of colors."

the "lip," "left hip," "right thigh[,]" "right hand," and "right shin."  Petechiae-like[15] spots were also observed on the breasts, which could have been caused by "blunt-force trauma" or "suction."

To assist in her testimony regarding CW's genital examination, Nurse Davis referred to the stipulated diagram of the female genitalia, Exhibit 156.[16]  Nurse Davis observed "general redness" to the "labia majora."[17]  Redness, bruising, and petechiae were observed on the "labia minora,"[18] "introitus,"[19] and "hymen."[20]  Petechiae was observed on the "cervix."[21]  "[T]here was bruising and a tear to the posterior

---

[15]    Nurse Davis defined "petechiae" as "small red or purple spots that are caused by bleeding into the skin."

[16]    The diagram in Exhibit 156 depicts female genitalia, with no labeling of individual genital parts.

[17]    Nurse Davis defined "labia majora" as the "outer areas" of the female genital, which are "speckled with . . . hair" on the diagram.

[18]    Referring to the diagram in Exhibit 156, Nurse Davis explained that the "labia minora" was the "[i]nternal" area of the "labia majora."

[19]    Nurse Davis defined the "introitus" as the area "surrounding" the "speckled pieces of hair" on the diagram in Exhibit 156.  We take judicial notice that "introitus" is defined as "the vaginal opening."  Introitus, Merriam-Webster, https://www.merriam-webster.com/medical/introitus; see HRE Rule 201(b).

[20]    Referring to the diagram in Exhibit 156, Nurse Davis explained that the "hymen" is the "surrounding" area of the hole that leads to the "vagina."

[21]    Nurse Davis did not define or explain "cervix."  "Cervix" is defined as "the narrow outer end of the uterus."  Cervix, Merriam-Webster, https://www.merriam-webster.com/dictionary/cervix (last visited May 31, 2023); see HRE Rule 201(b).

fourchette[22] and the fossa navicularis[.]"[23]  (Footnote added.)
There was a tear on the fold between the labia majora and labia
minora.  Nurse Davis collected the following from CW:  "buccal
swabs";[24] "oral swabs"; swabs from "both of her breasts[,]"
"external" and "internal" "vaginal area," "face," and "both of
her hands underneath her fingernails."

In conjunction with a search warrant, Nurse Davis
collected the following from Browder:  "buccal swabs[,]" "penile
and scrotum swabs," swabs from his "upper arms" and "hands," a
hair sample, and "scrapings from underneath the fingernails on
both hands."

**DNA Expert Yuen's testimony:**  Sebastian Yuen (**Yuen**),
an expert in serology and forensic DNA testing, testified that a
"serological test" was performed on the swabs obtained from CW's
breasts, mouth, external and internal vaginal area, and face.
The swabs obtained from CW's breasts did not contain a full DNA
profile; however, based on the partial profile obtained, Yuen
determined that the DNA profile contained a mixture of two
individuals, with male DNA present, and that Browder could not
be "excluded as a possible contributor" to the foreign DNA
profile.  The swabs obtained from CW's face contained a DNA
profile of two individuals, with male DNA present, and Browder
"[was] excluded" as a possible contributor.  The swabs obtained
from CW's mouth and external and internal vaginal area contained

---

[22]    Referring to the diagram in Exhibit 156, Nurse Davis explained
that the "fossa navicularis" is the "area of skin" at the bottom of the hole
leading to the vagina that "protrudes from the vagina to the outer
genitalia."

[23]    Referring to the diagram in Exhibit 156, Nurse Davis explained
that the "posterior fourchette" is the "very thin . . . piece of skin" that
"protect[s]" the "introitus."

[24]    Nurse Davis explained that "buccal swabs" are swabs that go
"inside the cheek."

no male DNA or p30 protein, a protein found in semen.  A
serological test was also performed on the penile and scrotum
swabs obtained from Browder.  There was no presence of p30
protein present or human DNA on the swabs.

**Defense case**

Browder did not present any evidence and did not
testify.

**Closing arguments, verdict, sentencing**

During closing argument, the prosecutor made the
following argument pertinent to this appeal, and the remarks at
issue are underscored:

> She's 80 years old. She was nervous, shaking on the
> witness stand. She was emotional and crying. She was
> scared. She told you she was scared that morning. She was
> scared at the hospital. She was scared even a week and a
> half later, and she was still scared in court. This is
> consistent with someone who's been traumatized.
>
> . . . .
>
> So again, ladies and gentlemen, when we look back at
> the credibility factors that Judge Kim instructed you on as
> well as the evidence presented in this case, when we turn
> to that question, "Is [CW] believable?" State submits the
> answer is, "Yes." And because [CW] is believable let's look
> to the elements that the State needs to prove.
>
> As to Charge 1 we know that on June 15, 2019
> [Browder] vaginally penetrated [CW] with his penis. That he
> did so with strong compulsion; the threats of bodily
> injury, the force of holding her down. State's proved the
> second element. And [Browder] knew exactly what he was
> doing when he did those things.
>
> As to count Charge 2, that's the fellatio count. We
> know [Browder] shoved his penis again and again into [CW]'s
> mouth. He also did so with the same strong compulsion; the
> threats to kill her, the threats to her life, as well as
> holding her down and also [Browder] he [sic] knew what he
> was doing.

(Emphases added).[25]  The prosecutor conceded that CW "couldn't
remember some things[,]" and that CW "admitted . . . that she

---

[25]     The defense did not object to these arguments.

didn't remember" certain things.  In conclusion, the prosecutor urged the jury to "[h]old the defendant responsible for what he did to [CW] and find him guilty as charged[,]" based on the "evidence of the terrifying events that [CW] lived through in her tent on June 15th, 2019."

In the defense's closing argument, Browder's trial counsel circled back to repeat the defense theory presented in opening statement, stating:  "I told you the evidence would show fictitious cries of sexual assault by [CW], a rush to judgment by the Hawaiʻi police investigating this case, and the wrongful arrest of an innocent teenager and the evidence showed all of this."  The defense argued that the contradictory evidence proved that the case involved "fictitious cries of rape, of sexual assault by [CW]"; "[t]here was no investigation of the alleged crime scene"; there was no "corroboration" of CW's story from the evidence presented, such as the lack of DNA evidence; and there was nothing "putting [] [Browder] in [CW]'s tent."

The jury found Browder guilty of all counts, and following sentencing, Browder timely appealed.

## II. STANDARD OF REVIEW

### Prosecutorial Misconduct

"The term 'prosecutorial misconduct' is a legal term of art that refers to *any* improper action committed by a prosecutor, however harmless or unintentional."  State v. Maluia, 107 Hawaiʻi 20, 25, 108 P.3d 974, 979 (2005).  Prosecutorial misconduct may be subject to plain error review "[b]ecause prosecutorial misconduct impacts the fundamental right to a fair trial . . . ."  Hirata, 152 Hawaiʻi at 31, 520 P.3d at 229 (citing State v. Riveira, 149 Hawaiʻi 427, 431 n.10, 494 P.3d 1160, 1164 n.10 (2021)).  Thus,

> [o]nce the defense establishes misconduct — objection or no objection — appellate review is the same: "After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against the defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome."

Id. (quoting Riveira, 149 Hawai'i at 431, 494 P.3d at 1164).

**Sufficiency of Evidence**

When reviewing sufficiency of evidence on appeal, "[e]vidence adduced in the trial court must be considered in the strongest light for the prosecution . . . ." State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010) (quoting State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998)). ‼

> The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

Id. (quoting Richie, 88 Hawai'i at 33, 960 P.2d at 1241).

### III. DISCUSSION

**A. The prosecutorial misconduct in closing argument was not harmless beyond a reasonable doubt.**

Citing Hirata, Browder argues that the following remarks constituted misconduct: (1) that CW's testimony was "consistent with someone who's been traumatized"; and (2) "As to Charge 1, we know that on June 15, 2019 the defendant vaginally penetrated [CW] with his penis." (Emphasis added.) We also address the second "we know" argument immediately following the first one: "As to count Charge 2, that's the fellatio count. We know the defendant shoved his penis again and again into [CW]'s mouth." (Emphasis added.) The full context of the remarks is as follows:

14

THE COURT: . . . Madam Prosecutor, you may commence when you're ready.

[PROSECUTOR]: Thank you, Your Honor.

"Do what I say or I'm gonna kill you." "You have to want me." "I'm bigger. I can kill you with this rock." This is what [Browder] told [CW] in the early morning hours of June 15th, 2019.

Now, ladies and gentlemen, over the course of last week you heard from a number of witnesses and you saw a number of photographs, but ultimately this case comes to one question. Is [CW] believable?

Now, Judge Kim just read you a number of jury instructions, and on page 9 you'll find a number of credibility factors that you can use to determine the credibility of witnesses.

I'm not gonna [sic] reread everything again for you, but when you look at some of them like her demeanor, her candor, her lack of motive and is [sic] what she says makes sense, then the State submits that, yes, the answer to this question is that [CW] is believable. And because [CW] is believable as stated on page 11 of your jury instructions, the testimony of even a single witness if believed is sufficient to prove a fact.

So now let's look a little bit closer at the credibility factors and the evidence that you heard over the last week.

So looking at [CW]'s appearance, demeanor, manner of testifying you saw her and you got to meet her over the course of two days of questioning.

She's 80 years old. She was nervous, shaking on the witness stand. She was emotional and crying. She was scared. She told you she was scared that morning. She was scared at the hospital. She was scared even a week and a half later, and she was still scared in court. This is consistent with someone who's been traumatized.

To the next factor, the extent to which [CW] is supported or contradicted by other witnesses.

First we have the initial HPD officers, and they told you when they met [CW] a few hours after the vicious attack she was still emotional, crying, injured but was able to give a disclosure to them of how she had been violated and hurt in her tent.

They found [Browder] in his tent, informed him of [CW]'s report and then subsequently arrested him.

15

You also heard from Michael Demotta, the first person who saw [CW] after the attack, and she told you that [CW] gripped onto her arms. She was shaking, crying and most importantly she was now injured which was different from how she had looked the day before when [Demotta] saw her.

[Demotta] helped her call 911, and [Demotta] also helped her go to the bathroom because she was still shooken [sic] up.

Then you heard from Detective Acob. A week and a half -- about a week and a half after the incident he met with [CW], and he told you how she was still emotional and crying when she had to describe the sex acts that [Browder] forced upon her. And when he showed her that photo lineup with [Browder]'s picture in it she again became emotional and looked away.

Then you heard from Detective Delaries who met [CW] a few hours after the incident at the Kona Hospital, and again she was emotional. She was shaky, crying.

But Detective Delaries also told us about what he saw with -- later that day when he went to try and get [Browder]'s underwear. He told you what he saw on the surveillance.

He told you that he had instructed another detective to obtain [Browder]'s underwear but that didn't happen. Instead we have a hole in the [Browder]'s paper jump -- paper pants, and we see [Browder] shoving his hand, according to Detective Delaries, down the toilet and flushing multiple times.

Then you heard from Nurse Davis who documented the injuries to [CW]; the face injuries, the injuries on her hand, her legs, her -- her breasts, the inside of her mouth, and then her vaginal injuries, the bruising, the petechiae and the tear.

Then you also heard about that Nurse Davis said the -- her injuries and what she documented in her examination were consistent with [CW]'s patient history.

She also told us about how [CW] in those hours in between the attack and from the time she got to the hospital to get examined she had used the bathroom multiple times. She had -- she had eaten cough drops, drank water.

And then finally you heard from Sebastian Yuen, the DNA analyst who testified that the DNA on [CW]'s breast was a mixture of two people. One was [CW] and [Browder] couldn't be excluded, and over a million other people, unrelated other people would have to be tested in order to get that same result.

16

He also told you that, yes, there was no male DNA on the oral swabs or the vaginal swabs obtained from [CW], but he told you how foreign DNA can be removed and he said -- he gave examples of showering, of swimming. That water has an impact.

[CW] testified that multiple times after the incident not only was she urinating on herself in her tent but she used the bathroom multiple times, wiped herself and that's why there's no male DNA. The witnesses support [CW]'s testimony.

Now, turning to [CW]'s candor or frankness. Ladies and gentlemen, she admitted to the things that she did.

She admitted she helped [Browder]. She admitted she complied with his demands in that tent to survive, and she also admitted that she made some mistakes in her statements initially to the police. She told you that she had mistaken the arm. That she couldn't remember some things. She also admitted the things that she didn't do. She didn't scream. She didn't try to run away, and right after she couldn't call 911 and she told you all why. Because she was fighting to survive. She believed [Browder] was going to kill her.

She also admitted to you the things that she didn't remember. Under a long cross-examination by defense counsel she admitted that, yes, she didn't remember certain things she had told some of the initial officers or Detective Acob and that it was because she was in shock, and she couldn't remember word by word exactly what she told multiple people about this attack that she had just endured.

But she did tell you exactly what [Browder] did to her. She has been consistent that he entered her tent while she was sleeping, came on top of her, threatened to kill her, told her to cover her eyes, vaginally and orally penetrated her, sucked on her breasts, made her touch his penis with her hand and then jammed a sharp object into her back as he smashed her face down to the bottom of the tent. [CW] has hid nothing from you.

Now, let's now look to the probability or improbability of [CW]'s testimony.

[CW] was alone. She went camping by herself. On the night of June 14th, 2019 she was sleeping. She told you she went to bed about 7:30 that night. [CW] was an easy target, and [Browder] had his opportunity.

So after all the other campers went to sleep at about 2:30 on June 15, 2019 he entered her tent, and once he was inside that tent he held her down, covered her eyes, told her, "I'll kill you," then vaginally penetrated her.

17

And then when that didn't work and he wasn't satisfied enough told her that, "You have to want this. You have to help me."

Then he sucked on her breast, told her to touch his penis before he shoved it into her mouth again and again, and then before he was gonna [sic] leave put that sharp object into her back, threatened to kill her again and told her to lay her head down on the pillow.

What happened to [CW] and what she told you happened to her on June 15th, 2019 makes sense.

Now, let's look at [CW]'s interest if any in the result of this case.

She has nothing to gain. You saw her. She was terrified and scared to even testify and be here today or be in court with us last week.

Her temper, feeling or bias towards [Browder].

Prior to June 12th, 2019 they were complete strangers, but [CW] told you that she tried to help [Browder] because she felt bad for him because he told her he had no one. [CW] has no reason to lie.

So again, ladies and gentlemen, when we look back at the credibility factors that Judge Kim instructed you on as well as the evidence presented in this case, when we turn to that question, "Is [CW] believable?" State submits the answer is, "Yes." And because [CW] is believable let's look to the elements that the State needs to prove.

As to Charge 1 we know that on June 15, 2019 the defendant vaginally penetrated [CW] with his penis. That he did so with strong compulsion; the threats of bodily injury, the force of holding her down. State's proved the second element. And [Browder] knew exactly what he was doing when he did those things.

As to count Charge 2, that's the fellatio count. We know the defendant shoved his penis again and again into [CW]'s mouth. He also did so with the same strong compulsion; the threats to kill her, the threats to her life, as well as holding her down and also the defendant he knew what he was doing.

(Emphases added.) While the transcript reflects that no objections were made, plain error review applies to remarks that constitute misconduct. See Hirata, 152 Hawaiʻi at 30-31, 520 P.3d at 228-29.

18

**1. Under the circumstances of this case, the consistent-with-someone-who's-been-traumatized remark did not constitute misconduct.**

Browder argues, pursuant to Hirata, that the prosecutor "improperly expressed her personal belief about the CW's credibility and injected new evidence by explaining to the jury that the CW's testimony was consistent with one who is traumatized."  In response, the State argues that under the general definition of "trauma,"[26] the prosecutor's remark was supported by the evidence of CW's own testimony regarding the effects of the alleged sexual assault when reporting the incident to others, and those witnesses' testimonies describing CW's emotional condition soon after the alleged incident.[27]

Hirata involved the prosecution of the offense of "continuous sexual assault of a minor under the age of fourteen years."  152 Hawaiʻi at 28, 520 P.3d at 226.  The minor complainant (**Minor**), Minor's parents, a police officer, a detective who interviewed Minor, a doctor who examined Minor, an

---

[26]   The State cited general dictionary definitions of "traumatized" or "trauma," which state:  "'a startling experience which has a lasting effect on mental life; a shock.'"  See State's Supplemental Answering Brief at 7 (quoting *Trauma*, The Random House Dictionary of the English Language, 1507 (The Unabridged Edition 1973)).

[27]   In its Supplemental Answering Brief, the State pointed to Officer Ayau's testimony that CW was sad, crying, and scared; Officer Kailiuli's testimony that CW was "distraught[,]" under "stress[,]" "shooken [sic] up[,]" and "a little afraid"; Detective Acob's testimony that CW turned away from Browder's photo and "started to tear"; Nurse Davis's testimony that CW was "very tearful and very shaky" during the examination; Detective Delaries's testimony that CW would "cry[,]" "shake[,]" and her "lips would quiver" during her report "less than 24 hours" after the incident.  The State also noted how CW explained inconsistencies between her trial testimony and her statements to the officers and Nurse Davis, that she was "in shock"; had been "fearing for [her] life" because she felt that she "was going to be killed"; and that at that point, CW "did not have much strength to . . . say everything exactly the right or the correct way . . . ."  The State further related that CW testified that she understood her oath "[t]o tell the truth"; that she was "trying to get the words out correctly"; and she still felt "a lot scared [sic] and just very shaky."

expert in the dynamics of child sexual abuse (**child sexual abuse expert**), the defendant, the defendant's parents, and the defendant's girlfriend testified at trial. Id. at 29, 520 P.3d at 227. Minor's mother testified that the Minor was "hesitant and scared" when telling her parents about the alleged sexual assault. Id. at 37, 520 P.3d at 235 (Nakayama, J., dissenting). Minor testified that she was "scared" to tell the defendant that she did not like what the defendant was doing to her, and Minor was "scared" that the defendant would hurt her if she told someone. Id. at 38, 520 P.3d at 236 (Nakayama, J., dissenting). The child sexual abuse expert testified regarding "common memory problems observed in children who have experienced something 'traumatic[,]'" and how children often cannot recall surrounding details of shocking or traumatic events. Id. at 39, 520 P.3d at 237 (Nakayama, J., dissenting). The child sexual abuse expert's explanation of dynamics of child sexual abuse included "delayed disclosure" and "tunnel memory," but did not include "evidence about post-abuse 'trauma' or how traumatized children act or testify in court." Id. at 33 n.14, 520 P.3d at 231 n.14. In closing argument, the prosecutor in Hirata argued:

> So let's go through the factors of [Minor]'s credibility. Her appearance, demeanor, her manner of testifying. She came here last week. You saw her. She's 11 years old. She was nervous and understandably so. And she tried to be brave up there on the stand. She answered all of my questions. She answered all of the defense attorney's questions. Almost three hours up there.
>
> And then at the end of almost those three hours, she couldn't be brave anymore, and you saw her when she got emotional. She broke when the defense attorney continued to call – to question her credibility and if she was making this up, and her answer to you was this really happened. It's consistent with a child who is traumatized.

Id. at 29, 520 P.3d at 227 (emphasis added).

In a 3-2 decision, the Hawaiʻi Supreme Court vacated the defendant's conviction because, inter alia, it found the

consistent-with-a-child-who-is-traumatized remark was serious prosecutorial misconduct:

> The DPA improperly expressed her personal belief about CW's credibility and injected new evidence by explaining to the jury that CW's testimony is "consistent with a child who is traumatized." Her unsupported comment invited the jury to infer that she had undisclosed information about CW's mental health, information that could corroborate a trauma-inducing event like the charged crime. We hold that the DPA's remarks constituted serious prosecutorial misconduct.

Id. at 33, 35-36, 520 P.3d at 231, 233-34.[28]

### a. The "traumatized" remark referred to and was supported by the evidence, and was not an improper expression of personal belief.

Browder's contention that the remark was without evidentiary support, as in Hirata, and thus constituted an improper expression of the prosecutor's personal belief, lacks merit under the circumstances of this case.

"A statement about a witness's credibility that is made without reference to the evidence or facts supporting the assertion amounts to an expression of personal opinion." State v. Salavea, 147 Hawaiʻi 564, 582, 465 P.3d 1011, 1029 (2020). In Hirata, the prosecutor's argument that CW's testimony was consistent with a traumatized child was based on the prosecutor's own evaluation and opinion of CW's breakdown and reaction being cross-examined, which the majority said was "unsupported" by any evidence.

Here, the prosecutor's argument that CW's testimony was consistent with a traumatized person was not based on the prosecutor's own evaluation and opinion of CW's reaction to

---

[28] At the time of closing arguments on December 14, 2021, in Browder's jury trial, this court had issued a November 12, 2021 Summary Disposition Order affirming Hirata's conviction. State v. Hirata, No. CAAP-20-0000689, 2021 WL 5273934, at *1 (App. Nov. 12, 2021) (SDO). Certiorari review was granted on March 23, 2022, and the Hawaiʻi Supreme Court's opinion was issued on October 31, 2022.

being cross-examined, as in Hirata, but was supported by "reference to the evidence or facts supporting the assertion[.]" See Salavea, 147 Hawaiʻi at 582, 465 P.3d at 1029. Prior to the remark, the prosecutor referenced evidence relating to CW's "appearance," "demeanor," and "manner of testifying" -- all credibility factors under the HAWJIC 3.09 credibility of witness instruction. Leading up to the challenged remark, the prosecutor pointed out that CW was "nervous," "shaking[,]" "emotional and crying[,]" and "scared" while testifying; "scared that morning" of the alleged incident; "scared at the hospital"; and "was scared even a week and a half later[.]" These evidentiary references supported the prosecutor's immediately following assertion that CW's appearance, demeanor, and manner of testifying was consistent with someone who was "traumatized."[29]

"[I]t is well-established that prosecutors are afforded wide latitude in closing to discuss the evidence, and may 'state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.'" State v. Udo, 145 Hawaiʻi 519, 536-37, 454 P.3d 460, 477-78 (2019) (citation omitted). Browder's defense presented in opening statement and in closing argument was that CW's claim of sexual assault was "fictitious." It was a reasonable inference that the fear CW manifested in her in-court testimony, as well as at

---

[29] "Traumatized" is defined as being "affected by physical or emotional trauma" or as "severely shocked and upset in a way that causes lasting emotional pain." Traumatized, Merriam-Webster, https://www.merriamwebster.com/dictionary/traumatized (last visited Oct. 6, 2023); Traumatized, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/traumatized (last visited Oct. 6, 2023). "Trauma" is defined as "a disordered psychic or behavioral state resulting from severe mental or emotional stress or physical injury," or "an emotional upset." Trauma, Merriam-Webster, https://www.merriam-webster.com/dictionary/trauma (last visited Oct. 6, 2023).

the time of the incident and immediately thereafter, tended to support the credibility of CW's claim that she had been sexually assaulted. See id. The prosecutor's remark was not an improper personal belief about CW's credibility untethered to evidence supporting the assertion; and it was within the wide latitude permitted in closing argument. See id.; Salavea, 147 Hawaiʻi at 582, 465 P.3d at 1029.

> **b. The "traumatized" remark did not inject new evidence or create an inference that the prosecution had undisclosed information about CW's mental health.**

Browder argues that, as in Hirata, there was no evidence adduced here that could "'legitimately support'" the prosecutor's claim that CW testified consistent with a traumatized person, because no witness testified about CW's mental health or psychological condition. Browder claims this remark "invited the jury to infer that the prosecution had undisclosed information about CW's mental health[.]"

In Hirata, a child sexual abuse expert had testified regarding the specific dynamics unique to children subjected to sexual assault -- the effects of a sexual assault on a child's memory, their ability to recall, and the timing of a child's disclosure. See 152 Hawaiʻi at 42, 520 P.3d at 240 (Nakayama, J., dissenting). Within this context, where the jury in Hirata had "heard no *evidence* that could legitimately support the prosecutor's claim that the [Minor] testified consistent with a traumatized child"; where the child sexual abuse expert had supplied "no evidence about post-abuse 'trauma' or how traumatized children act or testify in court"; and where "[n]o witness testified about [Minor]'s mental health or psychological condition"; — — the prosecutor's remark "exceed[ed] fair commentary on the *evidence*." Id. at 33, 33 n.14, 520 P.3d at 231, 231 n.14. The Hirata majority explained that the

23

prosecutor "effectively hinted she knew something the jury didn't know: [Minor] presently suffers trauma, and [Minor]'s demeanor and testimony <u>match the way victims of child sexual abuse testify</u>."  <u>Id.</u> (emphasis added).  Thus, the remark "injected new evidence" and inferred to the jury that the prosecutor "had undisclosed information about [Minor]'s mental health, information that could corroborate a trauma-inducing event like the charged crime."  <u>Id.</u> at 33, 520 P.3d at 231.

Here, in contrast to the lack of evidence that "could legitimately support the prosecutor's claim that the [Minor] testified consistent with a traumatized child" in <u>Hirata</u>, the jury in this case did hear evidence that could "legitimately support" the prosecutor's assertion that CW's demeanor was consistent with someone who had experienced a traumatic, shocking, startling, or emotionally upsetting event.  <u>Id.</u>; <u>see</u> Traumatized, <u>supra</u>; Trauma, <u>supra</u>.  The prosecutor's references to CW's manner of testifying and consistent pattern of fear at the time of the incident and immediately thereafter, were supported by the record in this case, by CW's own testimony, and corroborated by other witnesses.[30]  Unlike <u>Hirata</u>, this case did not involve the unique "way victims of child sexual abuse testify" or involve a particular dynamic for which specialized expertise to explain a witness's compromised ability to recall, report, and relate, is required.  <u>Id.</u>

We conclude that the prosecutor's remark did not inject new evidence or create an inference that the prosecutor

---

[30]   Witness Demotta testified that CW appeared to be "crying" and "shooken [sic] up."  Officers Ayau and Kailiuli testified that when they arrived at the Camp, CW appeared "scared" and "afraid."  Detective Delaries testified that when he met CW at the hospital, CW would "cry," "shake," and her "lips would quiver."  Nurse Davis testified that during the examination, CW was "tearful and very shaky[.]"  During an interview with Detective Acob about a week and a half after the alleged incident, Detective Acob testified that CW appeared to be "sad[,]" crying, and that she began to "tear" when she identified Browder's photo from a photograph lineup.

had undisclosed information about CW's mental health, and the remark did not constitute misconduct.  See Hirata, 152 Hawaiʻi at 33, 520 P.3d at 233; Salavea, 147 Hawaiʻi at 582, 465 P.3d at 1029.

### 2. Under the circumstances of this case, the "we know" remarks constituted misconduct that was not harmless beyond a reasonable doubt.

Citing Hirata, Browder argues that the prosecutor "improperly expressed her personal belief about the strength of the State's case" when using the words "we know" in closing argument.  We hold that the two "we know" remarks constituted improper expressions of the prosecutor's opinion on the strength of the evidence.

> A prosecuting attorney has a duty to seek justice, to play fair and square. A prosecuting attorney's words have an outsized influence on a jury. For this reason, this court has often directed prosecutors to not express personal beliefs about the evidence. See, e.g., State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986) (stating that prosecutors must "refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses").

Hirata, 152 Hawaiʻi at 33, 520 P.3d at 231.  "[E]xpressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate an attorney from the cause being argued."  Id. (quoting Salavea, 147 Hawaiʻi at 582, 465 P.3d at 1029).  A prosecutor's use of the pronoun "we" during closing argument constitutes misconduct because of the "implication of unity, and the suggestion of an alliance between the State and the jury" against the defendant, which is improper.  State v. Conroy,

148 Hawaiʻi 194, 202-03, 468 P.3d 208, 216-17 (2020).[31]  The Conroy court explained that:

> The prosecutor's use of the inclusive pronoun, "we," implied that the jury and the State had similar interests and were working together in convicting [the defendant] to provide CW justice. This implication of unity, and the suggestion of an alliance between the State and the jury against [the defendant], was improper:
>
> > In light of the "prestige associated with the prosecutor's office" and the "significant persuasive force" the prosecutor's argument is likely to have on the jury, this court has repeatedly recognized that the prosecutor "has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the

---

[31]  In Conroy, the supreme court held that "the prosecutor committed misconduct at least eight times," one of which included the prosecutor's use of the pronoun, "we."  The eight statements found improper were as follows:

> First, the prosecutor asserted that [the defendant] "was going to make sure that CW didn't give that smile to any other man, and she won't. She can't."
>
> Second, the prosecutor told the jury "we should teach her a new lesson. I say we teach her that there is justice in the world. I say we teach her that there can be justice in this...."
>
> Third, the prosecutor told the jury they were to find [the defendant] guilty to "put the smile back in her eyes."
>
> Fourth, the prosecutor asked the jury to consider that [the defendant] "broke something inside of CW."
>
> Fifth, the prosecutor noted the jury's purpose was to heal CW's spirit: "We all want CW's spirit to heal even if her face won't. But in order for that to happen, there has to be justice done."
>
> Sixth, the prosecutor repeated his admonition to the jury — previously ruled improper by the trial court - that its purpose was to provide justice to CW in order to heal her: "We all want CW's spirit to heal even if her face won't. But in order for that to happen, there has to be justice done."
>
> Seventh, the prosecutor asserted that "You break my heart, I break your face. That's what this case is about."
>
> And eighth, the prosecutor injected personal knowledge about the pain caused by a kick to the groin.

148 Hawaiʻi at 201-02, 468 P.3d at 215-16 (ellipses in original) (emphases and brackets omitted) (emphases added).

appearance of unfair advantage over the accused." State v. Basham, 132 Hawai'i 97, 116, 319 P.3d 1105, 1124 (2014).

Id. (emphases added).

Here, the prosecutor improperly used the term "we" by arguing to the jury, "we know that . . . the defendant vaginally penetrated" CW in Count 1, and that "[w]e know the defendant shoved his penis again and again into [CW]'s mouth" in Count 2. These arguments conveyed an improper "implication of unity" between the State and the jury against Browder, and gave an "appearance of unfair advantage over the accused." Conroy, 148 Hawai'i at 202-03, 468 P.3d at 216-17.

We now consider whether the "we know" misconduct was harmless beyond a reasonable doubt. "After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against the defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome." Riveira, 149 Hawai'i at 431, 494 P.3d at 1164 (citation omitted).

Regarding the first factor, the nature of the misconduct, the multiple uses of the pronoun "we" were improper expressions of the prosecutor's personal opinion that both the State and the jury "kn[e]w" that vaginal penetration in Count 1, and fellatio in Count 2, had been committed by Browder. The remarks improperly suggested an alliance between the State and the jury to convict Browder of the two most serious charges against him of first-degree sexual assault. This factor weighs in favor of Browder.

Regarding the second factor, the "promptness or lack of a curative instruction," we need not consider it where no

objection was made or curative instruction given.  See Hirata, 152 Hawaiʻi at 34, 520 P.3d at 232.

Regarding the third factor, the strength or weakness of the evidence against the defendant, "when a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, the evidence of the offense is not so overwhelming that it renders the prosecutor's improper statements harmless beyond a reasonable doubt."  State v. Williams, 149 Hawaiʻi 381, 396, 491 P.3d 592, 607 (2021) (internal brackets and citation omitted); accord Hirata, 152 Hawaiʻi at 35, 520 P.3d at 233 ("In cases reliant on the jury's credibility findings, misconduct attacking a defendant's credibility or bolstering a complainant's (or critical witness's) credibility is seldom harmless beyond a reasonable doubt." (citation omitted)).

Here, the State's case turned on the jury's assessment of CW's credibility, as the only persons present during the incident were CW, and the perpetrator, whom CW identified as Browder.  While there was evidence of physical injuries consistent with sexual assault, there were no eyewitnesses besides CW, and the DNA evidence was equivocal.  No physical or forensic evidence indicated that Browder had been in CW's tent. There was not overwhelming evidence of identification, and the State's case establishing Browder as the perpetrator was entirely dependent on CW's testimony.  Thus, the state of the evidence was not "so overwhelming" that it rendered the prosecutor's misconduct harmless beyond a reasonable doubt. See Williams, 149 Hawaiʻi at 396, 491 P.3d at 607.  This factor weighs in favor of Browder.

On this record, we conclude that there was a "reasonable possibility" that the misconduct might have

28

contributed to Browder's convictions in this case and was not harmless beyond a reasonable doubt.  See Hirata, 152 Hawai'i at 35, 520 P.3d at 233; see also Williams, 149 Hawai'i at 397, 491 P.3d at 608 (holding in a sexual assault prosecution that prosecutorial misconduct during closing argument was not harmless because the CW was "the only witness other than the defendant who could describe the actual acts constituting the offenses[,]" and the "evidence against [the defendant] was not so overwhelming that it rendered the prosecutor's misconduct . . . harmless"); State v. Prescott, No. CAAP-20-0000574, 2022 WL 622335, at *10 (Mar. 3, 2022) (SDO) (holding in a sexual assault prosecution that prosecutorial misconduct during closing argument was not harmless, where CW "was the only witness who testified about the alleged act").

**B. There was sufficient evidence adduced at trial to convict Browder of the sexual assault offenses.**

"It is well-settled that, even where this court finds trial error, challenges to the sufficiency of the evidence must always be decided on appeal."  Kalaola, 124 Hawai'i at 59, 237 P.3d at 1125 (cleaned up).  "Trial error[s]" include prosecutorial misconduct.  Id. at 52, 237 P.3d at 1118 (citing Burks v. United States, 437 U.S. 1, 14–15 & n.8 (1978)).  We thus address Browder's challenge to the sufficiency of evidence to support the sexual assault offenses.  Browder argues that there was insufficient evidence adduced at trial to convict Browder of sexual assault because there was no DNA profile recovered from the swabs obtained from CW or from the crime scene that matched Browder's DNA profile.  Viewing the evidence "in the strongest light for the prosecution[,]" see id. at 49, 237 P.3d at 1115, Browder's contention is without merit.

29

Here, Browder was charged with two counts of Sexual Assault in the First Degree for "sexual penetration by strong compulsion" for "vaginal penetration with his penis" and "fellatio" in violation of HRS § 707-730(1)(a).[32]  Browder was also charged with two counts of Sexual Assault in the Third Degree for engaging in sexual contact with CW by putting his "mouth on her breast" and "her hand on his penis" in violation of HRS § 707-732(1)(f).[33]  At trial, CW testified that on June 15, 2019, she was asleep in her camping tent when she was awakened, held against her will, and sexually assaulted.  CW identified the perpetrator as Browder, and that Browder penetrated her "vaginal area" with his penis, sucked on her breasts, told her to put her hands onto his penis, and stuck his penis into her mouth.  "[T]he testimony of merely one percipient witness constitute[s] substantial evidence to support a conviction . . . ."  State v. Eastman, 81 Hawaiʻi 131, 141, 913 P.2d 57, 67 (1996) (citation omitted).  Viewed in the strongest light for the prosecution, we conclude there was substantial evidence to support the jury's verdict convicting Browder of the sexual assault offenses.  See Kalaola, 124 Hawaiʻi at 49, 237 P.3d at 1115.

In light of our resolution, we do not address Browder's remaining contentions.

---

[32]    Under HRS § 707-730(1)(a) (2014), a person commits the offense of sexual assault in the first degree if the person "knowingly subjects another person to an act of sexual penetration by strong compulsion[.]"

[33]    Under HRS § 707-732(1)(f) (2014), a person commits the offense of sexual assault in the third degree if the person "knowingly, by strong compulsion, has sexual contact with another person[.]"

**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**IV. CONCLUSION**

For the foregoing reasons, the March 29, 2022 Judgment of Conviction and Sentence, entered by the Circuit Court of the Third Circuit, is vacated, and we remand for a new trial.

DATED: Honolulu, Hawaiʻi, October 20, 2023.

On the briefs:

Walter J. Rodby,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney
for Plaintiff-Appellee.

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge

31

CONCURRING OPINION BY LEONARD, J.

I concur with the majority's conclusion that the conviction of Defendant-Appellant Zeth Browder (**Browder**) must be vacated based upon prosecutorial misconduct in conjunction with the prosecutor's closing argument.

I agree with the majority's analysis and conclusion that the prosecutor's statements that "**we know** that on June 15, 2019 [Browder] vaginally penetrated [CW] with his penis" and "**[w]e know** the defendant shoved his penis again and again into [CW's] mouth" constituted misconduct. (Emphasis added). I also agree with the analysis and conclusion that the prosecutor's misconduct was not harmless beyond a reasonable doubt.

However, I further conclude that State v. Hirata, 152 Hawaiʻi 27, 520 P.3d 225 (2022), is indistinguishable from this case with respect to the prosecutor's statement to the jury that the complaining witness's (**CW's**) appearance, demeanor, and manner of testifying was consistent with someone who's been traumatized.

In both Hirata and this case, the defendant faced sexual assault charges. In both cases, the defendant's theory of the case was that there was no sexual assault. In Hirata, in closing argument, the prosecutor stated to the jury that their decision "'comes down to one question, is [CW] believable?'" Hirata, 152 Hawaiʻi at 29, 520 P.3d at 227. In the case now before us, the very same prosecutor stated to the jury "ultimately this case comes to one question. Is [CW] believable?" The prosecutor then made essentially the same

argument, except she noted the young age of the complaining

witness in <u>Hirata</u>, and the advanced age of CW in this case:

| <u>Hirata</u>, 152 Hawaiʻi at 29, 520 P.3d at 227: | This case (<u>Browder</u>) (emphasis added): |
|---|---|
| . . . . <u>And it also comes down to one question, is [CW] believable?</u><br><br>Now, the Court gave you the jury instructions that you all have in front of you, and on page 8, there are a list of factors that you can consider when you deliberate to determine if a witness is credible. So you look at their demeanor, their candor, lack of motive, and if what they say makes sense.<br><br>So when you look at the factors – and I'll go through them with you, ladies and gentlemen – the answer is clear to this question. Yes, [CW] is believable. And because [CW] is believable, it's – it is the testimony that has a convincing force upon you that counts, and the testimony of even a single witness, if believed, can be sufficient to prove a fact.<br><br>So let's go through the factors of [CW]'s credibility. Her appearance, demeanor, her manner of testifying. She came here last week. You saw her. She's 11 years old. She was nervous and understandably so. And she tried to be brave up there on the stand. She answered all of my questions. She answered all of the defense attorney's questions. Almost three hours up there.<br><br>And then at the end of almost those three hours, she couldn't be brave anymore, and you saw her when she got emotional. She broke when the defense attorney continued to call – to question her credibility and if she was making this up, and her answer to you was this really happened. <u>It's consistent with a child who is traumatized.</u> | . . . . [U]ltimately this case comes to one question. Is [CW] believable?<br><br>Now, [the Circuit Court] just read you a number of jury instructions, and on page 9 you'll find a number of credibility factors that you can use to determine the credibility of witnesses.<br><br>I'm not gonna reread everything again for you, but when you look at some of them like her demeanor, her candor, her lack of motive and is what she says makes sense, then the State submits that, yes, the answer to this question is that [CW] is believable. And because [CW] is believable as stated on page 11 of your jury instructions, the testimony of even a single witness if believed is sufficient to prove a fact.<br><br>So now let's look a little bit closer at the credibility factors and the evidence that you heard over the last week.<br><br>So looking at [CW]'s appearance, demeanor, manner of testifying you saw her and you got to meet her over the course of two days of questioning.<br><br>She's 80 years old. She was nervous, shaking on the witness stand. She was emotional and crying. She was scared. She told you she was scared that morning. She was scared at the hospital. She was scared even a week and a half later, and she was still scared in court. <u>This is consistent with someone who's been traumatized.</u> |

(Spacing between paragraphs altered).

In <u>Hirata</u>, the Hawaiʻi Supreme Court held that the prosecutor's remark that the complaining witness (also referred to as CW) testified "consistent with a child who is traumatized" was misconduct. <u>Hirata</u>, 152 Hawaiʻi at 33, 520 P.3d at 231. The supreme court explained its reasoning as follows:

> A prosecuting attorney has a duty to seek justice, to play fair and square. A prosecuting attorney's words have an outsized influence on a jury. For this reason, this court has often directed prosecutors to not express personal beliefs about the evidence. <u>See</u>, <u>e.g.</u>, <u>State v. Marsh</u>, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986) (stating that prosecutors must "refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses").
>
> Prosecutors are also forbidden from introducing new information or evidence in closing argument. <u>See</u> <u>Basham</u>, 132 Hawaiʻi at 113, 319 P.3d at 1121 ("Closing arguments are not the place to introduce new evidence outside the safeguards of the Hawaiʻi Rules of Evidence."). We have explained that "expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate an attorney from the cause being argued." <u>Salavea</u>, 147 Hawaiʻi at 582, 465 P.3d at 1029.
>
> Here, the jury heard the DPA opine that the CW testified "consistent with a child who is traumatized." But it heard no *evidence* that could legitimately support the prosecutor's claim that the CW testified consistent with a traumatized child.[13] No witness testified about CW's mental health or psychological condition.[14]
>
> [13]    Nor in most cases could they. <u>See</u> <u>Riveira</u>, 149 Hawaiʻi at 431, 494 P.3d at 1164 (explaining that testimony about "a crime's after-effects are rarely allowed" because the information is both irrelevant and highly prejudicial).
>
> [14]    The state's expert testified generally about delayed disclosure, "tunnel memory," and other dynamics of child sexual abuse. <u>But the expert supplied no evidence about post-abuse "trauma" or how traumatized children act or testify in court</u>. . . .
>
> The DPA improperly expressed her personal belief about CW's credibility and injected new evidence by explaining to the jury that CW's testimony is "consistent with a child who is traumatized." Her unsupported comment invited the jury to infer that she had undisclosed information about CW's mental health, information that could corroborate a

> trauma-inducing event like the charged crime. We hold that
> the DPA's remarks constituted serious prosecutorial
> misconduct.

Hirata, 152 Hawaiʻi at 33, 520 P.3d at 231 (emphasis added).

The rule of law applied to the prosecutor in Hirata is equally applicable to her in this case. The prosecutor was forbidden from introducing new information or evidence in closing argument. Expressions of personal opinion were also forbidden. In this case, the prosecutor gave the same opinion she did in Hirata, that the complaining witness testified consistent with a child/person who is traumatized. In Hirata, no witness testified about the complaining witness's mental health or psychological condition – in this case, no witness testified about the complaining witness's mental health or psychological condition.[1] In Hirata, there was an expert witness, but he supplied no evidence about post-abuse trauma or how traumatized children act or testify in court – in this case, there was no expert witness,

---

[1] The majority submits that the prosecutor's remark was supported by CW's testimony regarding the effects of the alleged sexual assault when reporting the incident to others, and those witnesses' testimonies describing CW's emotional condition after the alleged incident, when CW told them she had been sexually assaulted. This is not unlike Hirata, however, where the complaining witness testified that she got scared and was afraid after the alleged sexual assault, and her mother testified that when the complaining witness disclosed the alleged abuse, she was hesitant and scared, and she started crying as she spoke; the complaining witness in Hirata also became emotional during her testimony. 152 Hawaiʻi at 37, 38, 520 P.3d at 235, 236 (Recktenwald, C.J., dissenting). In Hirata, there was delay in the disclosure of the alleged sexual abuse, and delayed disclosure by sexually abused children was the subject of expert testimony. Id. at 37-38, 39, 520 P.3d at 235-36, 237 (Recktenwald, C.J. dissenting). However, that deviation from the fact pattern in Hirata does not support a conclusion that the serious prosecutorial misconduct in Hirata is distinguishable from the prosecutor's conduct in this case.

and there was no evidence about post-abuse trauma or how traumatized persons act or testify in court.

In Hirata, the supreme court concluded that the prosecutor expressed her personal belief about the complaining witness's credibility and injected new evidence by explaining that the complaining witness's testimony was consistent with a child who is traumatized – here, I conclude that the prosecutor expressed her personal belief about the complaining witness's credibility and injected new evidence by explaining that the complaining witness's testimony was consistent with a person who is traumatized. Like in Hirata, here, the prosecutor's unsupported comment invited the jury to infer that she had undisclosed information about CW's mental health, information that could corroborate a trauma-inducing event like the charged crime. As the supreme court held in Hirata, I would hold that the prosecutor's remarks here constituted serious prosecutorial misconduct.

Finally, having determined that both of the challenged remarks constitute prosecutorial misconduct, I will briefly turn to the issue of whether there is a reasonable possibility that this misconduct might have affected the outcome in this case. See, e.g., Hirata, 152 Hawaiʻi at 33, 520 P.3d at 231 (citing State v. Riveira, 149 Hawaiʻi 427, 431, 494 P.3d 1160, 1164 (2021)). As explained in Hirata, the appellate courts have

considered three factors, two of which have greater weight here,[2] *i.e.*, "the nature of the prosecuting attorney's misconduct" and "the strength or weakness of the evidence against the defendant." Id. at 34, 520 P.3d at 232.

As to the "consistent-with-a-child-who-is-traumatized misconduct," the supreme court concluded that, standing alone, that misconduct was reasonably likely to have affected the outcome of Hirata's trial. Id. at 35, 520 P.3d at 233. The nature of that misconduct in Hirata is indistinguishable from the consistent-with-a-person-who-is-traumatized misconduct in this case. As to the remaining factor, the strength or weakness of the evidence against Browder, the outcome of this case rests almost exclusively on the jury's decision about CW's credibility. As the prosecutor argued to the jury, "ultimately this case comes to one question. Is [CW] believable?" The defense's theory of the case, as laid out in Browder's closing argument, was the opposite: CW's story of what happened changed significantly with each telling, there is no hair, DNA, or other evidence supporting that Browder was in CW's tent, you (the jury) should not believe CW. CW was the only witness who could describe the actual acts and her testimony constituted the most significant evidence against Browder. See e.g., State v Williams, 149 Hawaiʻi 381, 397, 491 P.3d 592, 608 (2021).

---

[2]   There was no "curative instruction" (the other factor) here. The supreme court's rationale in Hirata for diminishing the weight of that factor applies here. See Hirata, 152 Hawaiʻi at 34, 520 P.3d at 232.

There was no overwhelming evidence of Browder's guilt. "In cases reliant on the jury's credibility findings, misconduct attacking a defendant's credibility or bolstering a complainant's (or critical witness's) credibility is seldom harmless beyond a reasonable doubt." Hirata, 152 Hawaiʻi at 35, 520 P.3d at 233 (citation omitted); see also Williams, 149 Hawaiʻi at 397, 491 P.3d at 608. Here, the prosecutor enhanced CW's credibility, not only through her testimony-consistent-with-a-person-who-is-traumatized misconduct, but also through her we-know-Browder-did-it statements to the jury. I conclude that there is reasonable possibility that the misconduct contributed to the trial's result and that the prosecutorial misconduct in this case was not harmless beyond a reasonable doubt.

Accordingly, I would vacate Browder's conviction based on these multiple instances of misconduct and remand the case to the Circuit Court.

/s/ Katherine G. Leonard
Associate Judge

7